391 A.2d 642

**Thomas ANDERSON et al.**

v.

**The AUTOMOBILE FUND et al.**

**Appeal of Elizabeth KUTNA.**

Superior Court of Pennsylvania.

Argued Dec. 15, 1975.

Decided July 12, 1978.

4

Theodore Clattenburg, Jr., Philadelphia, with him John C. Firmin, Philadelphia, for appellant.

Alan C. Gershenson, Philadelphia, with him John B. Brumbelow, Philadelphia, for appellee, Avco Financial Services, Inc.

James D. Crawford, Philadelphia, submitted a brief for appellee, A. B. C. Credit, Inc.

John J. Robinson, Upper Darby, submitted a brief for appellee, Springfield Dodge, Inc.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PER CURIAM:

The six Judges who decided this case being equally divided, the order is affirmed.

VAN der VOORT, J., files an opinion in support of affirmance and remand in which CERCONE and PRICE, JJ., join.

SPAETH, J., files an opinion in support of reversal in which JACOBS, President Judge, and HOFFMAN, J., join.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

## OPINION IN SUPPORT OF AFFIRMANCE AND REMAND

VAN der VOORT, Judge:

On June 2, 1971, appellant Elizabeth Kutna and her husband John met with representatives of appellee Avco Financial Services, Inc. and Springfield Dodge, Inc. to finance and take possession of a car which the Kutnas had previously agreed to purchase. Avco was one of at least seven lenders to whom Springfield regularly referred prospective car buyers, referrals being made (according to Springfield's answers to interrogatories) to the lender who would provide the buyer with the best terms for the amount of money and the year of car involved. Springfield had provided Avco prior to June 2 with the information needed by Avco for a credit check of the Kutnas, and Avco's representative arrived at Springfield's place of business on June 2nd prepared to consummate the loan. The final loan agreement was signed by Avco and the Kutnas, and a check for the purchase price less the down payment, made payable either to the Kutnas alone or to the Kutnas and Springfield as co-payees,[1] was presented to the Kutnas. The Kutnas endorsed the check, completed their purchase, and proceeded to drive the car home. On the way, the car began to smoke and buck and otherwise misbehave; the next day the car refused to run at all.

Unable to obtain satisfaction from Springfield Dodge, the Kutnas, after making only two payments to Avco, refused to make any further payments and instituted an action in equity against Avco and Springfield. Plaintiffs alleged in the complaint that Avco and Springfield had conspired to process and had processed the loan under the Consumer

1. Avco's answers to interrogatories and its answer to the Kutnas' motion for partial summary judgment state that the check was made payable to both the Kutnas and Springfield Dodge; Springfield's answers to interrogatories state that the check was made payable to the Kutnas. The lower court evidently overlooked Springfield's answers when it stated in its opinion that it was uncontested that the Kutnas and Springfield were co-payees on the check.

Discount Company Act (C.D.C.A.) [2] and the Small Loan Act [3] rather than under the Motor Vehicle Sales Finance Act (M.V.S.F.A.) [4] in order to obtain higher interest rates, cut off personal defenses of borrowers, and avoid certain disclosure requirements of the M.V.S.F.A. Plaintiffs also alleged various violations by Avco and Springfield of the Truth in Lending Act. [5] For violation of the M.V.S.F.A. and the Truth in Lending Act, the Kutnas demanded recission of the loan and car purchase agreements, return by Springfield of the Kutnas' $200.00 down payment, compensation by Springfield in the amount of $45.00 for out-of-pocket car expenses, return by Avco of payments made under the loan agreement, money damages, and injunctive relief. Avco counterclaimed for $792.00 (the unpaid portion of the loan) plus "interest on the unpaid but due portions from September 2, 1971." On motion by the Kutnas for partial summary judgment, the lower court, by Order of April 22, 1975, found against Springfield Dodge on the Truth in Lending claims, but in favor of Springfield on the Motor Vehicle Sales Finance Act claims. These findings for or against the Kutnas and Springfield are not involved in this appeal. The court also found in favor of Avco against the Kutnas. Avco moved for partial summary judgment on Avco's counterclaim against the Kutnas, and the lower court granted the motion on July 24, 1975, and entered judgment against the Kutnas in the amount of $792.00 plus interest. (The question of interest will be dealt with later in this opinion. Elizabeth Kutna brought this appeal from the Order of July 24, 1975.

Appellant first argues that since Springfield Dodge rather than the Kutnas arranged for financing of the automobile, the transaction was, in purpose and effect, an install-

2. Act of April 8, 1937, P.L. 262, as amended, 7 P.S. § 6201 et seq.

3. Act of June 17, 1915, P.L. 1012, as amended, 7 P.S. § 6151 et seq., repealed by Act of March 3, 1976, P.L. 40, No. 18, § 1.

4. Act of June 28, 1947, P.L. 1110, as amended, 69 P.S. § 601 et seq.

5. 15 U.S.C. § 1601 et seq.

ment sale, and as such came within the terms of the M.V.S. F.A. Section 3(10) of the M.V.S.F.A. defines "installment sale contract" as "any contract for the retail sale of a motor vehicle, or which has a similar purpose or effect under which part or all of the price is payable in two or more scheduled payments subsequent to the making of such contract, or as to which the obligor undertakes to make two or more scheduled payments or deposits that can be used to pay part or all of the purchase price . . . ." The loan agreement between Avco and the Kutnas was not a contract for the retail sale of a motor vehicle. Although it is possible that Avco would not have loaned money to the Kutnas for any other purpose than to buy a car from Springfield Dodge, the loan contract itself did not mention the use to which the proceeds were to be put, and Avco did not even take a security interest in the car. On the face of the loan contract then, a straight loan, not an installment sale, was involved. Three members of our court, however, would "collapse" the loan agreement between the Kutnas and Avco and the purchase agreement between the Kutnas and Springfield into one transaction, would find that this "collapsed" transaction had a purpose or effect similar to that of the usual installment sale contract, and would thus bring the total transaction within the § 3(10) definition of "installment sale contract". In *Waterbor, Inc. v. Livingood*, 179 Pa.Super. 610, 616, 117 A.2d 790 (1956), our court ruled that the M.V.S.F.A. was to be strictly construed.[6] Collapsing the two contracts into one would not constitute a mere failure to construe the M.V.S.F.A. strictly, it would require us to *stretch* the definition of "installment sale contract".

Another definition that would have to be extended is Section 3(4)'s definition of "seller". That section defines a "seller" as a "person engaged in the business of selling, hiring or leasing motor vehicles under installment sale contracts or any legal successor in interest to such person." Although Avco could not reasonably be termed a "seller"

6. The members of our court favoring reversal would hold, contrary to our decision in *Waterbor*, that the M.V.S.F.A. should be construed broadly.

under this definition (Avco was not involved in selling the car and did not succeed to any legal interest of Springfield), Springfield was in the business of selling cars and would come within the definition. Unless the definition of "seller" were distorted to include Avco, the anomalous situation would exist in which Springfield, the seller, could be convicted of violating § 19 of the M.V.S.F.A. for imposing excessive finance charges, and could be ordered to pay a fine or even have some employees imprisoned, while Avco, the lender, the party actually imposing the finance charges, would not be subject to these criminal penalties.

▆ Whether or not the definition of "installment sale contract" might be stretched to include the transaction in the case before us, Section 2 of the M.V.S.F.A. makes it clear that the Act was directed primarily at the "bailment lease" type of contract which was being used for the sale of motor vehicles in Pennsylvania in order to circumvent existing laws.[7] In addition, Section 36 of the M.V.S.F.A. makes it clear that the legislature specifically intended that the M.V.S.F.A. should not apply to business conducted lawfully under license issued pursuant to the C.D.C.A.[8] The C.D.C.A., which has its own licensing requirements, bonding requirements, limits on interest rates, notice and disclosure requirements, and criminal penalties, has broad application. The Act applies to any individual or group of individuals however organized that engages in this Commonwealth as

7. Section 2 states in part: "It is hereby determined and declared as a matter of legislative finding: . . . (b) That the agreement for the installment sale of motor vehicles in this Commonwealth has been generally cast in the form of the so-called 'Pennsylvania Bailment Lease' contract, in which the seller is technically the lessor, and the buyer is technically the lessee. By the use of this fictional instrument in the installment sale of motor vehicles, the extension of credit to the purchaser has been so inextricably entwined with the alleged bailment of the motor vehicle as to deprive the consumer of the benefit of existing laws."

8. Section 36 of the M.V.S.F.A. states: "This Act shall not affect or impair any business conducted lawfully under license issued pursuant to the Act of April eighth, one thousand nine hundred thirty-seven (Pamphlet Laws, two hundred sixty-two) known as the 'Consumer Discount Company Act', or supplements or amendments thereto."

principal, employee, agent, or broker, in the business of negotiating loans or advances of money on credit in the amount or value of five thousand dollars or less, and that charges, collects, contracts for, or receives interest, discount, bonus, fees, fines, commissions, charges, or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge. The Kutnas did not contend in the loser court that the C.D.C.A. did not apply, but rather alleged that Avco and Springfield conspired to finance loans under the terms of the C.D.C.A. in order to avoid having to comply with the terms of the M.S.V.F.A. As evidenced by Avco's answers to interrogatories, Avco was licensed under the C.D.C.A. and had to comply with the requirements of that Act. The loan was for an amount less than five thousand dollars, and the interest rate was greater than the standard legal rate of interest. The C.D.C.A. would clearly seem to cover the loan agreement between the Kutnas and Avco.

On considering a motion for summary judgment, a lower court can rely on the pleadings and answers to interrogatories for uncontroverted facts, but must ignore controverted facts which are not supported by separate affidavits. *Phaff v. Gerner*, 451 Pa. 146, 303 A.2d 826 (1973); Pa. Rule of Civil Procedure 1035. In the case before us, the lower court concluded that no material facts were in dispute, that the transaction came within the scope of the C.D.C.A., and that because the loan was covered by the C.D.C.A. it was exempted from coverage under the M.V.S.F.A. by § 36 of the M.V.S.F.A. An examination of the pleadings and answers to interrogatories reveals that the lower court was correct in its determination that there were no material controverted facts. Under the uncontroverted facts of this case as set forth in the pleadings and answers to interrogatories, the loan transaction as a matter of law either fell within the scope of the C.D.C.A. or it did not. If the loan fell within the terms of the C.D.C.A., it would be excluded from coverage under the M.V.S.F.A. by § 36 of the M.V.S.F.A. I would find that the lower court was correct in its

determination that the loan agreement between the Kutnas and Avco came within the scope of the C.D.C.A. and was excluded (because of § 36 of the M.V.S.F.A.) from the scope of the M.V.S.F.A.

Appellant next argues that the lower court erred in finding that Avco was not obligated to make the disclosures required of creditors by the Federal Truth in Lending Act and by regulations promulgated pursuant to that Act (Regulation Z).[9] Section 121 of the Act, 15 U.S.C. § 1631, provides that "[e]ach creditor shall disclose clearly and conspicuously, in accordance with the regulations of the Board, to each person to whom consumer credit is extended and upon whom a finance charge is or may be imposed, the information required under this part"; § 226.8 of Regulation Z provides that "[a]ny creditor when extending credit other than open end credit shall, in accordance with § 226.6 and to the extent applicable, make the disclosures required by this section . . . ." Section 103(f) of the Act, 15 U.S.C. § 1602(f), states that the term "creditor" shall refer to "creditors who regularly extend, or arrange for the extension of, credit for which the payment of a finance charge is required . . . ."; section 226.2(m) of Regulation Z defines a "creditor" as one who "in the ordinary course of business regularly extends or arranges for the extension of consumer credit, or offers to extend or arranges for the extension of such credit." In *Manning v. Princeton Consumer Discount Co., Inc.*, 533 F.2d 102 (3rd Cir. 1976), *cert. denied*, 429 U.S. 865, 97 S.Ct. 173, 50 L.Ed.2d 144 (1976), the Third Circuit ruled that a seller would be regarded as having "arranged credit" if he accepted a fee. Springfield in the case before us admittedly accepted a 3% fee from Avco for referring the Kutnas to Avco, and therefore "arranged credit" for the transaction; Springfield, as well as Avco, is clearly a "creditor" within the meaning of the Act and Regulation Z. Appellant argues that as creditors Avco and

9. Regulation Z is the common name for the provisions of Part 226 of Title 12 of the Code of Federal Regulations. These provisions are issued by the Board of Governors of the Federal Reserve System pursuant to § 105 of the Truth in Lending Act.

Springfield were both required by § 121 of the Act and by § 226.8 of Regulation Z to make the specific disclosures set forth in § 128 of the Act, 15 U.S.C. § 1638, and § 226.8(b) and (c) of Regulation Z. In *Manning*, in a virtually identical situation, the Third Circuit ruled that the seller, not the finance company, was obligated to make these disclosures. The court relied on § 226.6(d) of Regulation Z, which states in pertinent part; "The disclosures required under paragraphs (b) and (c) of § 226.8 shall be made by the seller if he extends or arranges for the extension of credit. Otherwise disclosures shall be made as required under paragraphs (b) and (d) of § 226.8." In accord with *Manning*, the lower court in the case before us properly found that Avco was not required to make the § 128 and § 226.8(b) and (c) disclosures. The lower court properly granted summary judgment on this issue in favor of Avco.

Appellant further argues that Avco was required, if not by § 226.8(c) then by § 226.8(d)(3) of Regulation Z, to disclose as a component of the finance charge the 3% referral fee which was paid by Avco to Springfield. Section 226.8(c) provides that certain disclosures must be made when a "credit sale" is involved; section 226.8(d) requires certain disclosures (including, under subsection (3), referral fees and other components of the finance charge) "[i]n the case of a loan or extension of credit *which is not a credit sale . . .*" (Emphasis added). A "credit sale" is defined in § 226.2(n) of Regulation Z as "any sale with respect to which consumer credit is extended or arranged by the seller." "Consumer credit" is defined in § 226.2(k) as "credit offered or extended to a natural person, in which the money, property, or service which is the subject of the transaction is primarily for personal, family, household, or agricultural purposes and for which either a finance charge is or may be imposed or which pursuant to an agreement, is or may be payable in more than four installments." The transaction in the case before us is clearly one involving "consumer credit" and is clearly a "credit sale" under the preceding definitions. As such, the transaction is controlled by § 226.8(c) and not by § 226.8(d)

of Regulation Z. Avco was not required by § 226.8(d) to disclose the referral fee.

Appellant next argues that Avco violated the Consumer Discount Company Act by having one of its agents sign the loan agreement with the Kutnas on the premises of Springfield Dodge rather than at one of Avco's registered offices, and that, because of this alleged violation of the Act, the loan agreement must be declared void and unenforceable.[10] The C.D.C.A. provides that domestic business corporations must be licensed with the Secretary of Banking in order to engage in the business of making installment loans, and the Act requires a separate license for each particular place of business. In the case before us, the loan transaction was consummated on the premises of Springfield Dodge, a location for which Avco did not have a license. There is nothing in the Act to prohibit properly licensed companies from sending their agents to other locations (an individual's home, a seller's place of business) for the purpose of finalizing loans, particularly when this is done, as in the instant case, for the convenience of the lender. In the absence of an allegation by the Kutnas that Avco utilized the premises of Springfield Dodge on a regular basis for the purpose of transacting business, the lower court properly granted Avco's Motion for Partial Summary Judgment on the Counterclaim. (Because of this finding, it is unnecessary to decide whether the civil remedy of recission of the loan agreement would be a proper remedy for violation of the C.D.C.A.).

Appellant's final argument is that the lower court incorrectly computed the interest which plaintiffs were ordered to pay to Avco. Appellant contends that the lower court should have awarded interest, if at all, not from the date the total amount of the loan would have become due and payable to Avco, but rather from the date of the adjudication in favor of Avco. When a contract for the payment of money has been breached, interest is allowable

10. This issue was raised in the Kutnas' Supplemental Memorandum of Law in answer to Avco's Motion for Partial Summary Judgment.

from the date of the breach, even though a bona fide dispute exists regarding the amount of the indebtedness. *Palmgreen v. Palmer's Garage*, 383 Pa. 105, 108, 117 A.2d 721 (1955). Assuming an acceleration clause in the loan agreement, the lower court in the case before us properly awarded interest on the unpaid balance of the debt running from the date the accelerated debt became due.

Appellant further contends that the loan agreement contained no acceleration clause. Attached to plaintiff's complaint as Exhibit D is a photocopy of the borrower's copy of a "Statement of Loan" form signed by the Kutnas. This form contains no acceleration clause. Avco's answer and counterclaim refer to Exhibit D as "the loan contract"; however, Avco's answer to interrogatory # 54 states that Exhibit D "does not fully reflect the forms executed by the Kutnas." Avco included with its interrogatory answers the borrower's copy of a "Statement of Loan" form, and a "Loan Agreement Borrower's Copy," which Avco referred to as "true copies (retyped) of the agreements which the Kutnas executed." Avco's version of the borrower's copy of the "Statement of Loan" form is essentially the same as plaintiffs' Exhibit D, except that Avco's "true copy" contains a confession of judgment clause and is, of course, unsigned. Avco's "Loan Agreement Borrower's Copy," which does contain an acceleration clause, has no counterpart in Exhibit D of the complaint. Both Avco's and the Kutnas' "Statement of Loan" forms contain the following provision: *"DEFAULT CHARGE*—In the event of default for 10 or more days in the payment of any payment of any loan made hereunder, Lender may assess and collect and Borrower agrees to pay an additional charge of 1½% per month on the amount in arrears and until paid in full in no event shall such charge be less than $1." The lower court on July 24, 1975, awarded Avco $792, plus interest at the rate of 1½% per month from September 13, 1971. Although this award presupposes an acceleration clause, the lower court made no specific finding of fact, and it is impossible for us to determine whether or not the loan agreement contemplated accel-

eration of payment in the event of default; we should therefore remand this case to the lower court for resolution of this issue. If the lower court would find that the agreement contained no acceleration clause, it would compute the interest for each individual payment from the time such payment would have been due and payable. If the court would find that the agreement did contain an acceleration clause, it would then compute the interest on the full amount of the accelerated debt, running from September 13, 1971.

CERCONE and PRICE, JJ., join in this opinion.

### OPINION IN SUPPORT OF REVERSAL

SPAETH, Judge:

This is an appeal from an order entering partial summary judgment.

Appellant, Elizabeth Kutna, was one of a number of plaintiffs who brought an action, both as individuals and as representatives of a class, against several automobile dealers and finance companies engaged in a method of financing the purchase of used cars known as "dragging the body." This term describes the technique whereby an automobile dealer who is unwilling or unable to extend credit to a potential customer persuades the customer to obtain a loan from a specified lender, usually a consumer discount company, with which the dealer has established a prior understanding. The dealer plays an active role in arranging the financing between the discount company and the potential customer (he "drags the customer's body" to the discount company). As compensation, the dealer receives an economic benefit at least to the extent that the customer has been provided with the funds necessary to buy the used car. In addition, he often receives a referral fee from the discount company.

Each of the named plaintiffs below was a purchaser of a used car. Each received a loan to make his purchase through the active participation of an automobile dealer from whom he had purchased his car. Of these transactions, the only one before us is that involving appellant.

Count III of the complaint describes the transaction between appellant, Avco, as lender, and Springfield Dodge as dealer. It is alleged that the financing of appellant's purchase of a used car was violative of both state and federal law. The state law claim is that the transaction failed to comply with the Motor Vehicle Sales Finance Act (MVSFA), Act of June 28, 1947, P.L. 1110, *as amended*, 69 P.S. § 601 *et seq.* The federal law claim is that Avco and Springfield, in their respective roles as lender and dealer, failed to make the required disclosures under the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.*, and the regulations promulgated under that Act. The prayer is for damages and rescission of both the purchase and loan agreements and also for punitive damages. Count IV of the complaint is a request by the plaintiffs as representatives of the class for injunctive relief against the defendants' future use of the "dragging the body" technique.

Upon motion by Avco, the lower court, by order dated July 24, 1975, granted partial summary judgment as to Counts III and IV of the complaint for the benefit of Avco only. By the same order, the court granted summary judgment against appellant Kutna on Avco's counterclaim for the outstanding amount of its loan to appellant, including default charges. I would reverse, at least with respect to the state law claim under MVSFA.

On May 22, 1971, appellant's husband went to Springfield's place of business to purchase a used car. After some negotiation with one of Springfield's salesmen, he chose a 1964 Chevrolet for a purchase price of $795.00. He told the salesman he would need financing and indicated he would seek it through the First Pennsylvania Company. The salesman said that a commercial bank, such as the First Pennsylvania Company, would not make a loan secured by a car as old as the one the Kutnas had chosen.[1] The salesman suggested that the Kutnas could get financing through Avco. The Kutnas had had no previous dealings with Avco.

1. There has been no allegation by appellant that this statement was not true.

Arrangements for the loan were made, not by the Kutnas, but by Springfield's salesman. He called Avco and supplied information on the contemplated sale and the loan required, as well as information necessary for Avco to make a credit investigation of the Kutnas. When Avco approved the loan, the approval was communicated nor direct to the Kutnas but through Springfield.

On June 2 the Kutnas returned to Springfield's place of business. There they met a representative of Avco and signed the loan agreement that had been arranged for them. Avco's representative gave the Kutnas a check representing the proceeds from the loan. The check was drawn to the Kutnas and Springfield as co-payees.[2] The Kutnas endorsed the check and gave it to Springfield's salesman. The tender of the check, in addition to a down payment previously made by the Kutnas, constituted full payment for the Chevrolet. As compensation for bringing it the Kutnas' business, Avco paid Springfield a "referral fee" of 3% of the loan. One quarter of this fee was paid the salesman who had arranged the loan.

The day after appellant and her husband took possession of their Chevrolet it became inoperative. The Kutnas informed both Springfield and Avco of the car's condition. Avco responded that it was not responsible and that payments on the loan would have to be made irrespective of any problems that the Kutnas had with the car. The Kutnas made two monthly payments on the loan, but, after receiving no satisfaction from Springfield regarding repair of the car, they informed both Springfield and Avco of their intention to rescind their purchase of the car and the loan on the ground of breach of warranty.

As noted above, in the complaint the plaintiffs sought to bring the transaction between the Kutnas, Springfield, and Avco within the MVSFA. If successful, this would serve to

2. Judge VAN der VOORT states that the check was drawn either to the Kutnas alone or to the Kutnas and Springfield as co-payees. However, the lower court states as an "uncontested fact" that the Kutnas and Springfield were co-payees on the check. Lower Court Opinion of April 22, 1975, at 2–3.

impose liability for breach of warranty upon Avco as lender as well as on Springfield as dealer. Imposition of such liability on Avco would also be relevant to Avco's counterclaim, for it would justify the Kutnas' failure to make the monthly payments on the loan as conduct consistent with their attempt to rescind the loan agreement. Thus the warranty claim serves a dual role, being an element in appellant's cause of action and in her defense against Avco's counterclaim.

Avco contends that its dealings with the Kutnas represent a simple, direct loan to a borrower under the Consumer Discount Company Act (CDCA), Act of April 8, 1937, P.L. 262, *as amended*, 7 P.S. § 6201 *et seq.* It argues that as a holder in due course with respect to the Kutna note, it is not subject to any defenses or claims that appellant as buyer may have against Springfield as seller.

Thus the determinative issue is whether the Kutnas-Springfield-Avco transaction can be brought within the MVSFA.[3]

The MVSFA was enacted to remedy certain evils in the automobile financing area that were not addressed in its predecessor statute, the CDCA. In its section on findings and declarations of policy, the MVSFA states that because of legal technicalities and unequal bargaining power, automobile consumers are

> at the mercy of unscrupulous persons and are being intolerably exploited in the installment purchase of motor vehicles.

---

**3.** Judge VAN der VOORT finds that the MVSFA cannot apply here, because section 36 of the Act exempts loan agreements regulated by the CDCA. I agree that section 36 does this, but I disagree that the loan in this case was a CDCA loan.

As appellee seems ready to admit, the CDCA regulates direct personal loans between a consumer discount company and a borrower. If, as I have concluded, *see* text *infra*, the loan in this case was the functional equivalent of the kind of installment sale contract that the MVSFA was aimed at, it follows that the loan was not "business conducted . . . pursuant to . . . the 'Consumer Discount Company Act'," and therefore section 36 of the MVSFA has no relevance.

69 P.S. § 602

The section also states that "nefarious, unscrupulous and improper practices" in automobile financing are being practiced

> not only among some sellers, but also among some *sales finance companies* and some banks, which acquire contracts arising out of installment sales of motor vehicles
>
> . . ..

*Id.* (emphasis added)

In order to remedy this exploitation of consumers, the legislature, through the MVSFA, imposed a strict and comprehensive regulatory scheme on sellers and lenders in the business of automobile financing. The statute, *inter alia*, requires the licensing of installment sellers and finance companies, 69 P.S. § 604; imposes a ceiling on finance charges of automobiles installment sale contracts, 69 P.S. §§ 619, 620; imposes disclosure requirements with respect to installment sale contracts, 69 P.S. § 613; and does away with the holder-in-due-course defense with respect to holders of obligations of consumers under installment sale contracts, 69 P.S. § 615 (F).

The regulatory scheme becomes effective only upon the existence of an installment sale contract. The statute defines installment sale contract broadly:

> "Installment sales contract" or "contract" shall mean any contract for the retail sale of a motor vehicle, or which has a similar purpose or effect under which part or all of the price is payable in two or more scheduled payments subsequent to the making of such contract, or as to which the obligor undertakes to make two or more scheduled payments or deposits that can be used to pay part or all of the purchase price . . . .

69 P.S. § 603(10)

Appellant seeks to bring her transaction with Avco and Springfield within this definition by arguing that the loan from Avco and the sale by Springfield should not be viewed as separate transactions but as integrated parts of a single transaction. She borrows a concept often applied in tax

cases, and seeks to "telescope" or "collapse" the loan and sale, thereby meeting the statutory requirement of a "contract . . . as to which [she undertook] to make two or more scheduled payments" on the purchase price.

In appraising this argument, it is important to keep in mind that the MVSFA is remedial legislation. It must therefore be construed broadly to effect its overall purpose of protecting consumers from unfair practices by both automobile sellers and lenders. *Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812 (1974), *Stollar v. Continental Can Co.*, 407 Pa. 264, 180 A.2d 71 (1962). *See also*, 1 P.S. § 1928. The substance, not the form, of a transaction is controlling under the MVSFA. *Equitable Credit Co. v. Stephany*, 155 Pa.Super. 261, 38 A.2d 412 (1944), *Smith v. Gold*, 4 D. & C.2d 745 (Philadelphia Co. C.P.). Thus this court has held that a cause of action for rescission on behalf of consumers may be implied in the MVSFA. *Roxy Auto Company v. Moore*, 180 Pa.Super. 603, 122 A.2d 87 (1956).

Before the MVSFA was enacted it was common practice for an automobile dealer to extend credit to a customer. The customer would sign an installment sale contract and a note calling for periodic payments. The dealer would then discount, or sell, the note to a finance company. The finance company was thereby insulated by the holder in due course doctrine from any claim arising out of the condition of the automobile. The MVSFA had the effect of stripping this insulation from the finance company. 69 P.S. § 615(F). It is evident that the "dragging the body" technique is a response to the MVSFA. The hope is that by bringing the finance company into the transaction sooner, the regulatory scheme of the MVSFA can be avoided.

Viewed from the perspective of the consumer, which given the remedial nature of the MVSFA is the view we must take, there is no substantive difference between the discounting technique and "dragging the body." The change from the one to the other is cosmetic only and provides no benefit to the consumer, in whose interest the MVSFA was enacted. The regulatory scheme of the statute should not

be susceptible of avoidance by such a superficial restructuring of the automobile financing and sale transactions.

It is clear that Springfield and Avco had had prior dealings. Several other potential customers of Springfield had been "dragged" to Avco for automobile loans. The method of operation used by Springfield and Avco foreclosed any opportunity for a consumer to shop around for his financing. Appellant had no way of knowing that Springfield had a direct economic stake in having Avco finance the purchase. Moreover, all contact with Avco was by Springfield's salesman, and the "closing" of the loan took place, not in Avco's but Springfield's place of business. Avco made the loan to appellant in the form of a check drawn to Springfield as co-payee, thus insuring that appellant could not use the loan to purchase an automobile from anyone but Springfield.[4]

Thus Springfield and Avco sought to avoid application of the MVSFA as well as to maximize their profits. Springfield was enabled to make more sales by procuring the necessary funds for its customers, and in addition received a referral fee for each loan customer it supplied to Avco. As for Avco, loan customers were handed over to it without any effort or expense in the form of advertising or solicitation. Further, if successful in avoiding the application of the MVSFA, Avco could charge a higher interest rate than permitted under the statute, escape the disclosure requirements of the statute, and retain its holder in due course defense with respect to warrantee claims arising out of the sales of automobiles it had financed.

Given these facts, the loan and the sale should be collapsed into a single transaction so far as appellant is concerned. After acting to instill in the mind of the consumer an identity between itself and the automobile dealer, Avco should not be permitted to deny that identification when it ceases to be profitable. The relationship of Springfield and

4. The co-payee procedure may have independent commercial reasonableness when used to insure purchase-money security interest under Article 9 of the Uniform Commercial Code, 12A P.S. § 9–103, but that justification is unavailable to Avco since the loan to appellant was unsecured.

Avco was so close, and their method of operation so tightly coordinated and controlled, that for all practical purposes the loan and sale amounted to a package, presented to the consumer on terms well within the legislature's injunction against "nefarious, unscrupulous and improper practices." 69 P.S. § 602.

The issue of whether the loan and the sale transactions in the purchase of an automobile can be collapsed to come within the definition of an installment sale contract as used in the MFSFA appears to be one of first impression in our appellate courts.[5]  However, we are not without guidance. In *Casey v. Philadelphia Auto Sales Co.*, 428 Pa. 155, 236 A.2d 800 (1968), our Supreme Court anticipated the issue and suggested that such treatment might be appropriate.  *Casey* involved an appeal from a decree in equity in favor of the plaintiff, a purchaser of an automobile, and against the seller and the lender of the purchase price.  The decree ordered rescission of the sale contract, cancellation and return of the judgment note attached to the loan obligation, and damages.  The Supreme Court noted that the plaintiff had borrowed the purchase price directly from the finance company, but that the finance company was aware that it was financing the purchase of an auto.  The court therefore reversed, holding that the plaintiff had an adequate remedy at law against the finance company since under the MVSFA any claims or defenses that the plaintiff had against the seller could be asserted against the finance company.

A recent development in federal law also requires comment.  The Federal Trade Commission, acting under the authority of the Truth-in-Lending Act, has recently promul-

---

5.  In *Paul R. Webber, Inc. v. Duffy*, 10 Lebanon Co.Leg.J. 475 (Lebanon Co. C.P.1965), the court focused on the contractual and economic relationship between the lender and the dealer to justify collapsing the loan and sale transactions and to find the MVSFA applicable and violated.  *Cf. Beacon Loan Corporation v. Kemmerer*, 61 Luz.L.Reg. 199 (Luzerne Co. C.P.1961), where a loan for the purchase of an automobile was held not to be regulated by the MVSFA.  There, the buyer evidently selected the finance company herself prior to negotiation with the dealer.  Also, there appears to have been no referral fee paid the dealer by the lender or any other economic relationship between them.

gated a rule [6] that would embrace a transaction such as the one between Springfield, Avco and appellant.[7] The rule makes it unlawful for any seller of consumer goods or services affecting commerce who has referred customers to a particular creditor to accept for his goods or services out of the proceeds of a loan from creditor unless the contract made in connection with the loan contains a notice to the effect that the creditor or subsequent holder of the obligation is subject to all claims and defenses that could be asserted against the seller.[8] A proposed amendment to the rule would place an affirmative duty on creditors to include the notice in their consumer credit contracts.[9]

It is therefore clear that the trend of the law is toward limiting, not expanding, the holder in due course doctrine and the insulation from liability it provides a purchase-money lender.[10] The doctrine should not be permitted to be resurrected in the field of automobile finance, after its apparent demise almost thirty years ago in the MVSFA.

The order of the lower court should be reversed.

JACOBS, President Judge and HOFFMAN, J., join in this opinion.

**6.** Federal Trade Commission Regulation Rule, title 16, C.F.R. Ch. 1, Subch. D, par. 433, *promulgated* November 14, 1975, *effective* May 14, 1976, 40 F.R. 53506; *as amended* December 15, 1975, *effective* December 15, 1975, 40 F.R. 58131.

**7.** The rule, of course, has no direct effect on this case since it was promulgated after the loan and sale to appellant.

**8.** The text of the required notice is:
ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

**9.** *Federal Trade Commission Proposed Amendment to Sec.* 433.2, *issued* November 18, 1975; 40 F.R. 53530; *Final notice* February 5, 1976; 41 F.R. 5305.

**10.** *See generally,* Littlefield, Preserving Consumer Defenses: Plugging the Loophole in The New UCCC, 44 N.Y.U.L.Rev. 272, 272–73, 292–97 (1969).