**In re Helen B. JOYCE, Debtor.**

**Helen JOYCE, Plaintiff,**

**v.**

**FIDELITY CONSUMER DISCOUNT CO., Defendant.**

**Bankruptcy No. 83–00038G.**
**Adv. No. 83–1101G.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 26, 1984.

**250**

Henry J. Sommer, Community Legal Services, Inc., Philadelphia, Pa., for debtor Helen B. Joyce.

Lawrence T. Phelan, Philadelphia, Pa., for defendant, Fidelity Consumer Discount Co.

James J. O'Connell, Philadelphia, Pa., trustee.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge.

The predominant issue in the controversy at bench is whether a creditor has violated the Truth In Lending Act ("the TILA"), 15 U.S.C. §§ 1601–1667e, due to alleged shortcomings in the disclosure statement issued by the creditor. For the reasons stated herein, we find that the debtor has established her entitlement to relief under the TILA.

The facts of this case are as follows:[1] The debtor contracted to purchase an automobile from a car dealer which dealer directed the debtor to arrange financing with Fidelity Consumer Discount Company ("Fidelity"). The debtor failed to prove by a preponderance of the evidence that she was misled into believing she would be dealing with "Fidelity Bank" rather than with "Fidelity Consumer Discount Company." The debtor obtained the loan on August 23, 1979, in exchange for which she granted Fidelity a security interest in her home and the car.

Due to the debtor's failure to meet her debt repayment schedule, Fidelity repos-

---

**1.** This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052 (effective August 1, 1983).

sessed the vehicle on three occasions although the debtor regained possession of the car by paying significant portions of the arrearages on the car as well as the costs of repossession. The debtor failed to prove by a preponderance of evidence that Fidelity or its agents caused damage to the car other than damage necessitated by the task of repossession. Under the same evidentiary standard the debtor also failed to prove that Fidelity or its agents "cursed" at her or "called [her] a liar."

Fidelity filed a proof of claim against the debtor in the amount of $3,250.35, but, excluding unmatured interest, the claim totaled only $1,630.93 as of October 25, 1983. Shortly thereafter, the debtor commenced the action at bench alleging violations of the TILA, as well as breaches of various state laws. She also contends that Fidelity's claim should be reduced since a portion of that claim is for unmatured interest.

In the course of discovery under the Federal Rules of Civil Procedure and the Bankruptcy Rules, the debtor requested from Fidelity all disclosure statements or other notices of her rights. Fidelity failed to provide all the relevant documents and at trial the debtor requested us to rule that the documents which were not produced be deemed not to exist and we granted that sanction. Among the missing documents is the debtor's notice of her right to rescind the loan transaction.

The TILA is a federal statute which regulates the terms and conditions of consumer credit. Its congressionally declared purpose is to assure the informed use of credit through a meaningful disclosure of credit terms so that consumers can more readily compare different financing options and costs. 15 U.S.C. § 1601. For all loans which fall within its purview the TILA requires the creditor to issue the debtor a disclosure statement summarizing certain information found in the loan documents. The information which must be disclosed is defined in the TILA and Regulation Z, 12 C.F.R. § 226.1, *et seq.*

■ We initially note that although the one year statute of limitations for a debtor's commencement of an action under the TILA has lapsed, we have held that in bankruptcy a debtor may commence such an action to reduce a creditor's claim against him, notwithstanding the passage of the one year bar date. *Hanna v. Lomas and Nettleton Co. (In Re Hanna),* 31 B.R. 424 (Bankr.E.D.Pa.1983). We predicated this holding on the basis that the filing of a proof of claim was an action to collect on a debt against which the debtor could commence an action for recoupment under the TILA.

■ Under the TILA a creditor must provide a debtor in a consumer credit transaction with a notice of the debtor's right to rescind the loan agreement within three days after its consummation when the creditor retains or acquires a security interest in the debtor's home although this rule is subject to certain express exceptions including the purchase money financing of a home. 15 U.S.C. § 1635(a).[2] Due to the

**2.** § 1635. Right of rescission as to certain transactions

Disclosure of obligor's right to rescind
(a) Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section. 15 U.S.C. § 1635(a). This section was amended in 1980, although the loan at issue was granted in 1979. The parties are in agreement that the

above described discovery sanction we imposed against Fidelity, no notice of the debtor's right to rescind is deemed to exist, and consequently Fidelity failed to comply with § 1635(a). Since we have found Fidelity liable for this violation of the TILA, it is unnecessary for us to address the debtor's other bases for relief under that statute.

In a case such as this the TILA provides that liability for violations of the statute include actual damage, costs, reasonable attorney fees, and twice the amount of the finance charge; but such damages on the finance charge shall not be lower than $100.00 nor greater than $1,000.00. 15 U.S.C. § 1640(a).[3] The debtor has proved no actual damages although the finance charges are in excess of $1,000.00 and consequently, we will award the debtor $1,000.00 plus costs and attorney fees under the TILA.

Under the debtor's second cause of action she asserts that on two bases Fidelity violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, Pa.Stat.Ann. tit. 73, §§ 201–1 et seq. The first is predicated on the debtor's assertion that she was misled into believing that financing for the vehicle would be arranged by "Fidelity Bank" rather than "Fidelity Consumer Discount Company."

As we stated above the debtor failed to prove that Fidelity misled the debtor into believing she would be dealing with a different financial institution. The second purported violation is based on Fidelity's failure to disclose that the debtor could have obtained less expensive financing elsewhere. The debtor has neglected to point to any particular provision of the Pennsylvania statute which would support this striking contention, and as a matter of law we hold that it does not. We alternatively hold that the debtor is not entitled to relief on the second alleged violation of the statute since she failed to prove that less expensive financing was available at other financial institutions. Thus, the debtor has no cognizable claim for relief under the Unfair Trade Practices and Consumer Protection Law.

Under her third cause of action the debtor asserts that Fidelity violated Pennsylvania's Motor Vehicle Sales Finance Act ("the MVSFA"). Pa.Stat.Ann. tit. 69, §§ 601 et seq., because Fidelity charged the debtor a higher rate of interest than was allowable under that statute. The MVSFA was passed in 1947 to curb "nefarious, unscrupulous and improper practices in the financing of the sale of motor vehicles" in

---

amendments do not govern the dispute at bench, but nonetheless, we have quoted § 1635(a) with the incorporated amendments since the changes wrought in the statute in 1980 do not affect the outcome of this case.

**3.** § 1640. Civil liability
Individual or class action for damages; amount of award; factors determining amount of award
(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under section 1635 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—
(1) any actual damage sustained by such person as a result of the failure;
(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, or (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the lia-

bility under this subparagraph shall not be less than $100 nor greater than $1,000; or
(B) in the case of a class action, such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $500,-000 or 1 per centum of the net worth of the creditor; and
(3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court.
\* \* \* \* \* \*
15 U.S.C. § 1640(a). Section 1640(a) was also modified by the 1980 amendments to the TILA although that portion of the section quoted above remained unaltered.

the state. § 602(a).[4] More particularly the statute was aimed at agreements for the installment sale of motor vehicles under a device commonly called a "Pennsylvania Bailment Lease" contract "in which the seller is technically the lessor, and the buyer is technically the lessee." § 602(b). A "seller" licensed under this act may charge a debtor interest on an "installment sale contract" for the "retail sale" of a motor vehicle in Pennsylvania but the allowable rate of interest is dramatically limited— e.g., the maximum rate of interest that could have been charged for the purchase of a new motor vehicle was six percent. § 619.[5]

The debtor asserts that Fidelity is a "seller" under an "installment sale contract" for the "retail sale" of a motor vehicle since the car dealership directed the debtor to Fidelity for the financing of the vehicle. We find the debtor's position without merit for several reasons, the first of which is that the statute's findings and declaration of policy are not directed toward an entity such as Fidelity. Section 602(a) of the act indicates that the legislature sought to modify "practices [which] prevail not only among some sellers, but also among some sales finance companies and some banks, which acquire contracts arising out of installment sales of motor vehicles, and which frequently influence the credit poli-

---

4. § 602. Findings and declarations of policy
   It is hereby determined and declared as a matter of legislative finding:
   (a) That an exhaustive study by the Joint State Government Commission discloses nefarious, unscrupulous and improper practices in the financing of the sale of motor vehicles in this Commonwealth which are unjustifiably detrimental to the consumer and inimical to the public welfare. Such practices prevail not only among some sellers, but also among some sales finance companies and some banks, which acquire contracts arising out of installment sales of motor vehicles, and which frequently influence the credit policies of sellers.
   (b) That the agreement for the installment sale of motor vehicles in this Commonwealth has been generally cast in the form of the so-called "Pennsylvania Bailment Lease" contract in which the seller is technically the lessor, and the buyer is technically the lessee. By the use of this fictional instrument in the installment sale of motor vehicles, the extension of credit to the purchaser has been so inextricably entwined with the alleged bailment of the motor vehicle as to deprive the consumer of the benefit of existing laws.

5. § 619. Finance charges
   A. A seller licensed under the provisions of this act shall have the power and authority to charge, contract for, receive or collect a finance charge, as defined in this act, on any installment sale contract covering the retail sale of a motor vehicle in this Commonwealth, which shall not exceed the rates indicated for the respective classification of motor vehicles as follows:
   Class I. New motor vehicles, except those having a cash price of ten thousand dollars ($10,000) or more and used primarily for commercial purposes and except new trucks or truck tractors having a manufacturer's

gross vehicular weight of fifteen thousand (15,000) pounds or more and new semitrailers or trailers designed for use in combination with truck tractors, six percent (6%) per year.
   Class II. Used motor vehicles of a model designated by the manufacturer by a year not more than two (2) years prior to the year in which the sale is made, nine percent (9%) per year.
   Class III. Older used motor vehicles of a model designated by the manufacturer by a year more than two (2) years prior to the year in which the sale is made, twelve percent (12%) per year.
   Class IV. New motor vehicles having a cash price of ten thousand dollars ($10,000) or more and used primarily for commercial purposes, and except new trucks or truck tractors having a manufacturer's gross vehicular weight of fifteen thousand (15,000) pounds or more and new semitrailers or trailers designed for use in combination with truck tractors, seven and one-half percent (7½%) per year.
   Class V. New mobile homes, such percent established as a maximum finance charge for mobile homes by regulation of the Federal Housing Administration, pursuant to the National Housing Act of June 27, 1934 (48 Stat. 1246), whether or not the mobile home is subject to a sale on credit or loan insured or guaranteed in whole or in part by such administration.
   Class VI. New trucks and truck tractors having a manufacturer's gross vehicular weight of fifteen thousand (15,000) pounds or more and new semitrailers and trailers designed for use in combination with truck tractors, ten percent (10%) per year.
Pa.Stat.Ann. tit. 69, § 619(a). The quoted material reflects the state of the statute at the time the loan agreement was consummated. Section 619(a) has since been amended.

cies of sellers." Thus, the statute sought to modify the conduct of (1) immediate sellers, such ·as car dealerships, and (2) financial institutions which acquire contract rights in the debtor's obligation to the seller through purchase or assignment of the debtor's note as well as (3) financial institutions which frequently influence the credit policies of sellers. In the case at bench Fidelity does not fit within any of these three categories. Fidelity is not the seller, § 603(4); Fidelity did not acquire another entity's contract rights, it created its own; and lastly, there is no evidence of record that Fidelity influenced the credit policy of the car dealership. We additionally conclude that, in the case at bench, there is no "installment sale contract covering the retail sale of a motor vehicle." § 603(10). The contract is merely a loan agreement.[6]

■ The debtor's fourth cause of action is based on her allegations that Fidelity wrongfully repossessed her car. The first basis for relief under this theory is that the debtor was more than current in her payments since the rate of interest should have been calculated under the MVSFA. Since we held above that said statute is not applicable, this predicate for relief is without foundation. The debtor's second theory is grounded on her contention that Fidelity violated the good faith requirement of 13 Pa.Cons.Stat. § 1203[7] of Pennsylvania's Uniform Commercial Code since Fidelity allegedly indicated to her that it would not repossess the vehicle until she received funds from a designated source. The only evidence tending to prove that Fidelity offered these assurances, is the debtor's testimony, the weight of which is undercut by the fact that she could not identify which individual informed her of Fidelity's alleged intent not to repossess. Under this second theory, the debtor necessarily contends that she relied on the statement and consequently, she did not resort to alternative sources of funds to repay the arrearages in order to stem any plans for repossession. We find the debtor's reliance on the purported statement questionable since the vehicle was repossessed two previous times *but only after those repossessions* did the debtor cure the arrearages so as to retake possession of the automobile. Thus, we hold that the debtor has failed to prove a cause of action under § 1203.

■ Under her fifth cause of action the debtor alleges that Fidelity violated regulations on debt collection practices promulgated by the Pennsylvania Bureau of Consumer Protection which prohibit the use of profane language, the natural consequence of which is the abuse of the debtor. The only evidence supporting the debtor's averments is her own testimony. Once again she could not identify the individual or individuals who allegedly "cursed" at her and "called [her] a liar," and for this lack of identification, coupled with her questionable credibility, we found above that the debtor failed to prove by a preponderance that the statements at issue were made by employees of Fidelity.

■ The debtor's final cause of action is based on her assertion that Fidelity's claim against her estate should be reduced since part of that claim consists of unmatured interest. On objection, 11

---

**6.** Only one appellate case cited by the parties addresses the issue of whether an entity such as Fidelity should be bound by the MVSFA. *Anderson v. Automobile Fund,* 258 Pa.Super. 1, 391 A.2d 642. In *Anderson* the Pennsylvania Superior Court affirmed, by an evenly divided vote, a decision of the lower court that the financing entity was not subject to liability under the act. Since the affirmance was predicated solely on the lack of a majority vote, we are faced with a lack of clear precedent. Nonetheless, in addressing the issue presented here we examined in *Anderson* the rationales espoused in the opinion in support of reversal and the one in support of affirmance and incorporated above in our opinion many of the reflections offered in the opinion for affirmance since we believe the bases for the result sought there were more meritorious.

**7.** § 1203. Obligation of good faith
    Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement.
    13 Pa. Cons. Stat. § 1203.

U.S.C. § 502(b)[8] mandates that we disallow any portion of a claim which is for unmatured interest. Unmatured interest includes interest which is not yet due and payable. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 352, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, at 6308. Fidelity's only defense to the debtor's assertion is based on two cases from our court, *In Re Einspahr*, 30 B.R. 356 (Bankr.E.D.Pa. 1983), and *In Re Evans*, 20 B.R. 175 (Bankr.E.D.Pa.1982). Both cases deal only with the requirement that a chapter 13 plan provide that the value of property distributed under the plan on account of a secured claim is not less than the amount of such claim. *Evans* and *Einspahr* do not stand for the proposition that unmatured interest is allowable notwithstanding § 502(b)(2). As we stated above, Fidelity's claim amounts to $1,630.93 after the unmatured interest is disallowed.

8. § 502. Allowance of claims or interests
  (a) * * *
  (b) *Except as provided in subsections (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition,* and shall allow such claim in such amount, except to the extent that—
  (1) * * *
  (2) such claim is for unmatured interest.
     *    *    *    *    *    *
11 U.S.C. § 502.