## West Milton State Bank v. Foust

*H. William Koch,* for plaintiff.
*Pamela M. Isackes and Peter B. Macky,* for defendants.

RANCK, *J.,* December 14, 1976—

## HISTORY OF THE DISPUTE

It appears that defendants, like so many others, were victims of the "Agnes" deluge of 1972. Aid was secured in the form of a 12 foot by 54 foot 1972 Commodore mobile home supplied by the Department of Housing and Urban Development. Defendants resided in this structure for about one year when, pursuant to HUD regulations, they were required to either return physical possession of the mobile home to HUD, or purchase same. Electing the latter course, defendants, on May 14, 1973, secured a loan from West Milton State Bank, plaintiff herein, to effectuate their desires. Defendants borrowed $3,100, and in conjunction therewith purchased $148.49 of various types of credit insurance. To this loan was assessed a total finance charge of $649.11, raising total payment owing to $3,897.60. The annual percentage rate was 9.24 percent. This debt was to be discharged in 48 equal installments. The security agreement listed defendants' soon-to-be-acquired mobile home as collateral.

Two days after signing the security agreement with plaintiff, defendants entered into a contract

with the United States for purchase of the mobile home. Plaintiff alleges in his brief, and we can nowhere find denials or assertions to the contrary, that all negotiations concerning this sales contract were carried on exclusively between defendants and the agent for the Federal government. An examination of the sales contract, plaintiff's exhibit number one, reveals that it is *not* an installment sales contract. Rather, defendants, in consideration for the mobile home, were required to pay the full purchase price, in this case $2,705, sans sales tax. This sales contract was neither discounted nor in any other way assigned to plaintiff bank. Thus, this sales contract between defendants and the United States was both separate and distinct from the prior and independent transaction between plaintiff and defendants which appears, in both form and substance, to have been a purchase money direct loan repayable in installments and secured by the mobile home.

The parties, at trial, stipulated that defendants had made payments pursuant to the loan agreement until March 1975, and that, after that time, defendants were in default. Plaintiff soon thereafter initiated an action in replevin to gain possession of the collateral under the terms of the security agreement. Defendants filed an answer with new matter and plaintiff, in turn, lodged an answer to the new matter. A trial without a jury was held at which time the parties stipulated to the following issues:

(1) Does the Motor Vehicle Sales Finance Act apply to the instant case?

(2) If so, were its provisions violated?

(3) If violated, what is the effect of such violation?

## DISCUSSION

Defendants' new matter alleges that the loan transaction in question is subject to and in violation of the Motor Vehicle Sales Finance Act of June 28, 1947, P.L. 1110, sec. 1, as amended, 69 P.S. § 601 et seq. The answer to this question involves drawing fine distinctions in statutory interpretation which at least one jurist has suggested is the most difficult job for a court to perform. Counsel are correct in stating that there are no cases directly on all fours, but there are at least two, not cited in either brief, which are helpful. Before we ponder the cases, a close inspection of the statute will be made.

Section 602(a) of the act states, in part:

"Such practices [those cited as improper] prevail not only among some sellers, but also among some sales finance companies and some banks, *which acquire contracts* arising out of installment sales of motor vehicles, and which frequently influence the credit policies of sellers." (Emphasis supplied).

This language clearly brings banks and other lenders within reach of the act. But the operative words are: "which acquire contracts." This phrase implies that the act operates only against those lenders who are intimately involved in the sales transaction themselves or are successors in interest. Of course, the most obvious situation is where the seller assigns the sales contract to the financing bank. The word "acquire" is not defined in the act, but its common meaning in the law of contracts is "to come to have" or "to secure" a right or contract. See Black's Law Dictionary 41 (4th Ed., 1968). It is our belief that the authors of the act used the term, "which acquire contracts," in a re-

strictive sense, limiting the act's machinery to those situations where the lender is either a party to, or comes into possession of, the sales contract. The court in Beacon Loan Corporation v. Kemmerer, 51 Luz. 199 (1961), supports this interpretation: "That Act [Motor Vehicle Sales Finance Act] deals with sales of automobiles on an installment plan and the rights between seller and purchaser *and any assignee of the seller.*" (Emphasis supplied.)

It is again to be noted that there was no assignment, discounting or other transfer to plaintiff of the sales contract between defendants and the Federal government.

This position is fortified by the final summation of purpose in section 602 of the act. It is stated:

"Therefore, it is hereby declared to be the policy of the Commonwealth of Pennsylvania to·. . . bring under the supervision of the Commonwealth all persons engaged in the business of extending consumer credit *in conjunction with* the installment *sale of motor vehicles . . ." (Emphasis supplied.)*

The term "in conjunction with" means "in association with" (Black's Law Dictionary 893 (4th Ed., 1968)), or having the same occurrence in time and space. Again, we believe that this is a term of restraint circumscribing the operation of the act to those lenders who are involved in sales transactions or acquire the fruits therefrom in the form of an assignment.

Defendants direct our attention to the definition of "installment sales contract" found in section 603, 69 P.S. § 603(10). The act is said to apply to all installment sales contracts for the sale of motor vehicles: 69 P.S. § 602. Installment sales contract

is defined, in material part, as "any contract for the retail sale of a motor vehicle . . . whether or not the seller has retained a security interest in such motor vehicle or has taken collateral security for the buyer's obligation, and shall include any loan, any mortgage, any conditional sale contract, [and] any purchase-money chattel mortgage . . ."

Plaintiff focuses on the words, "whether or not the *seller* has retained a security interest" and concludes that this definition only embraces transactions between buyers and sellers and not the situation where a bank makes a direct loan. It is true that the above definition uses some rather broad language, but we agree with plaintiff's conclusion, if not his reasoning, that a direct loan, independent from the sales transaction, is not governed by the act.

With this review of the act, we turn to the cases. Most courts have construed the act in the relatively simplistic setting of credit improprieties on the part of sellers. On this plane, it is rather easy to blithely state that the scope of the act is the protection of "innocent, unwary automobile purchasers against the existing dishonest and unscrupulous practices of some motor vehicle salesmen." Newman v. Keys, 12 D. & C. 2d 705 (1957). See also Scipioni v. Sweitzer, 44 D. & C. 2d 794 (1968). But our examination of the act showed that it transcends into another dimension, the lending institutions. Whether dealing with the sellers or the lending institutions, however, the cases make plain that "this act was not intended to create a comprehensive system of regulation. . . .:" Whiteman v. Degnan Chevrolet, Inc., 217 Pa. Superior Ct. 424, 272 A.2d 244 (1970). This lends support to

the proposition that the policy statements found in section 602, supra, narrow operation of the act. Two cases, although not on all fours, make the matter clear.

In Beacon Loan Corporation v. Kemmerer, supra, defendant borrowed $600 from plaintiff for the purchase of an auto from a third party. Dissatisfied with the deal, defendant returned the car to the third party, a retail auto dealer, and refused to discharge the debt to plaintiff. Unlike the case at bar, the loan in Beacon Loan was not secured by the car, but rather by a judgment note signed by defendant. This fact, though, is not crucial in view of the definition of installment sales contract, supra. Importantly, the loan and note securing same was separate and apart from the sales contract. The court focused on this fact when it distinguished another case holding the act applicable where the note and sales contract were legally and physically integrated. Thus, in Beacon Loan, the court held the act inapplicable since, in effect, the transaction between plaintiff and defendant was but a "simple cash loan." The loan in the case at bar is not quite so simple, what with 48 installment payments, credit insurance, etc., but the clear meaning of Beacon Loan is not that a "simple loan" renders the act inapposite, but that a loan which is independent from the sales contract, in both form and substance, is not subject to the act.

This statement of law is bolstered by dicta from Paul R. Webber, Inc. v. Duffy, 10 Lebanon 475 (1965). In that case, defendant, one Duffy, signed a security agreement to the First National Bank of Bernville for a loan to purchase a car from plaintiff corporation. Attached thereto was a negotiable cognovit note. The bank papers had been com-

pleted by an employe of plaintiff. It is obvious, as the court noted, that the bank and plaintiff, a car dealership, had an agreement and that such arrangement interjected the bank into the transaction. In Duffy, the court held that what appeared in form to be a direct loan security agreement was, in substance, an installment sales contract within the meaning of the act. The court emphasized the close relationship between plaintiff and bank, and, hence, that the loan was not, in substance, a purchase money direct loan amounting to an independent transaction. The court did not carry this thought one step further, but the converse of this proposition, of course, is that if it had been a true direct loan security agreement which was an independent transaction, the act would not have applied.

As noted in the statement of facts, the purchase of the mobile home by defendants and the loan transaction between the parties were two separate and distinct happenings. We believe that defendants read the act much too broadly. Under their view, the scope of the act would amount to a comprehensive system of regulation. Such, however, was not the intent of the legislature: Whiteman v. Degnan Chevrolet, Inc., supra. The Statutory Construction Act of 1970, November 25, 1970, P.L. 707 (No. 230), added December 6, 1972, P.L. 1339 (No. 290), sec. 3, 1 Pa. C. S. §1501 et seq., offers some assistance. One section of that act, 1 Pa. C. S. §1921(c)(3), directs that emphasis be given to "[t]he mischief to be remedied." We believe that the legislature intended to control the unscrupulous practices of some motor vehicle salesmen and lending institutions acting, by assignment or otherwise, in alliance with them. This is not the

case here. Therefore, based upon our examination of the statute and existing case law, we hold that the Motor Vehicle Sales Finance Act does not apply to the case at bar. This decision, of course, renders moot the second and third issues. In view of the foregoing, we enter the following

## ORDER

And now, December 14, 1976, after trial without a jury and due consideration given to the testimony and to counsels' written and oral arguments, it is hereby ordered and directed that judgment for possession be entered in favor of plaintiff.