In re Joyce BROWN a/k/a Joyce Davis Brown a/k/a Joyce Jengo a/k/a Joyce Marie Brown, Debtor.

Joyce BROWN, Plaintiff,

v.

COURTESY CONSUMER DISCOUNT CO. and Edward Sparkman, Defendants.

Bankruptcy No. 91–10588S.
Adv. No. 91–0429S.

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 4, 1991.

Theodore Clattenburg, Jr., Community Legal Services, Inc., Philadelphia, Pa., for debtor.

Andrew L. Markowitz, Lahaska, Pa., for defendant Courtesy Consumer Discount Co.

Edward Sparkman, Philadelphia, Pa., trustee.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

A. INTRODUCTION

Factually, the instant proceeding presents, in the context of home improvement financing, a classic example of a creditor practice, usually arising in motor vehicle financing, which is colorfully referred

to as "dragging the body." Legally, this matter presents a complex interplay of state and federal law both as to liability and as to the appropriate remedies.

We conclude that "dragging the body" is violative of the Pennsylvania Home Improvement Finance Act, 73 P.S. § 500–101, *et seq.* ("HIFA"). We are supported in our result by the creditor's apparent admission of the application to this transaction of a federal Regulation preserving consumer defenses in transactions where a seller refers consumers to creditors, 16 C.F.R. § 433.1, *et seq.* (referred to as "the HDC Reg." because it limits the instances in which a holder of a consumer contract can become a *h*older in *d*ue *c*ourse). This violation of the HIFA triggers a violation of the Pennsylvania law prohibiting, *inter alia,* usury, Act 6 of 1974, 41 P.S. § 101, *et seq.* ("Act 6"), particularly 41 P.S. § 501 thereof. This usury law violation renders the disclosures of the "legal" finance charge and annual percentage rate of the finance charge ("the APR") in the transaction inaccurate, triggering disclosure violations and enabling the Debtor to rescind the transaction, pursuant to the federal Truth–in–Lending Act, 15 U.S.C. § 1601, *et seq.* ("the TILA"), because the creditor took a security interest in the Debtor's residence in connection therewith.

With respect to the appropriate remedies to which the Debtor is entitled, we conclude that rescission under the TILA, at least in this instance, eliminates the Debtor's claim of actual damages and renders additional state-law remedies inappropriate. Therefore, the Debtor is "limited" to the broad remedies applicable when a creditor fails to honor valid TILA rescission requests in a bankruptcy context: elimination of the creditor's secured claim, ultimately, through TILA recoupment, elimination of its unsecured claim as well; and liability of the creditor to the Debtor for statutory damages of $1,000 and the Debtor's reasonable attorneys' fees.

1. We note that the contract in the transaction involving Union was a HIFA contract between the contractor and the Debtor, which was assigned to Union by the contractor. This is the

## B. PROCEDURAL HISTORY

JOYCE BROWN ("the Debtor") filed an individual Chapter 13 bankruptcy case on February 1, 1991. On August 15, 1991, she settled a previous proceeding (Adversary No. 91–0227S), instituted on April 2, 1991, seeking to reduce the allowed secured claim of UNION MORTGAGE CO. ("Union"), also a holder of a mortgage against her home at 5019 Brown Street, Philadelphia, Pennsylvania 19139 ("the Home"), which arose out of a home-improvement contract.[1]

On May 28, 1991, COURTESY CONSUMER DISCOUNT CO. ("Courtesy") filed a secured proof of claim in the amount of $2,860.05. The Debtor, on May 30, 1991, probably unaware of Courtesy's filing, filed a proof of claim on behalf of Courtesy, contending that Courtesy had no more than an unsecured claim of $1,800. On June 19, 1991, the Debtor filed the instant proceeding to resolve the issue of Courtesy's legitimate claim against her. This is a core proceeding, pursuant to 28 U.S.C. §§ 157(b)(2)(B), (b)(2)(C), and (b)(2)(K), which we are obliged to hear and determine. 28 U.S.C. § 157(b)(1).

The hearing in the Debtor's main bankruptcy case to consider confirmation of the Debtor's proposed Chapter 13 plan was first scheduled on July 16, 1991. It was continued to the initial trial date of this proceeding on August 13, 1991. Both the confirmation hearing and the date of trial were continued by agreement for one last time until October 8, 1991.

The trial ensued on October 8, 1991. The Debtor and the Defendant were accorded until October 29, 1991, and November 19, 1991, respectively, to make post-trial submissions. The confirmation hearing was continued until December 19, 1991.

█ The parties agree that the material facts are, for the most part, undisputed. The only areas of dispute relate to the purchase of compulsory liability insurance

form which we ultimately hold that the instant transaction was required to take under the dictates of the HIFA.

on the Home in connection with this transaction. Our determination that "body-dragging" violative of the TILA is present in the loan transaction makes it unnecessary to resolve the difficult issues arising under TILA regarding the insurance purchase, since multiple TILA violations in a single transaction entitle an aggrieved consumer to but one recovery. 15 U.S.C. § 1640(g). Consequently, we need not and therefore do not resolve the parties' insurance-related TILA dispute, and hence the ultimately material facts are virtually all undisputed.

## C. FACTUAL HISTORY

The Debtor failed to graduate from high school and is employed as a housekeeper. She presented herself as a totally unsophisticated consumer. In June, 1989, the Debtor responded to a flyer left at the Home by L & G Contractors ("L & G") by contacting L & G by telephone concerning her need for repairs to her heater. Shortly thereafter, an individual identified by Courtesy as Leonard Gendleman ("Gendleman"), apparently the proprietor of L & G, came to the Home to solicit the Debtor's business. The parties ultimately agreed that L & G would install a heater and an accompanying electrical box or switch on the heater in the Home at a price of about $2,600. Gendleman did not, then or at any time, give the Debtor any contract or sale agreement from L & G describing the work to be done. However, Gendleman did inform the Debtor that "he would take care" of the financing for the work to be done. And he did.

On or about June 28, 1989, Gendleman contacted Courtesy and informed its agents that the Debtor was interested in making an application for a loan. Gendleman provided Courtesy with financial background information on the Debtor from which an agent of Courtesy prepared a written loan application form. In accordance with its usual procedure with Gendleman, with whom it entered into about 20 similar deals from approximately 1987 through 1989, Courtesy thereupon conducted its own credit inquiry on the Debtor and verified certain background information concerning the Debtor's place of residence and employment.

The Debtor's loan application was thereafter presented to Courtesy's branch manager, Benjamin Gray ("Gray"), for approval. Gray reviewed the application and made a decision to approve a loan to the Debtor in the amount of $3,000.00. Gray further decided, in accordance with Courtesy's usual practice, to condition the approval of the loan on the delivery by the Debtor of a mortgage on the Home to secure payment of the loan and on the Debtor's providing insurance on the Home to protect the Lender's interest therein.

Gray thereafter had one or more telephone conversations with Gendleman at which time he informed Gendleman that the Debtor's loan application had been approved in the amount of $3,000.00. Gray also informed Gendleman of the requirement that property insurance be provided by the Debtor to protect Courtesy's interest in the Home.

It is significant to note, at this juncture, that Courtesy holds a license under the Pennsylvania Consumer Discount Company Act, 7 P.S. § 6201, *et seq.* ("the CDCA"), and the Pennsylvania Secondary Mortgage Loan Act, 7 P.S. § 6601, *et seq.* ("the SMLA"), and regularly makes loans to consumers under those Acts. However, it is not licensed under the HIFA or any other Pennsylvania installment sales act, and therefore writes no loans under those acts.

During one of the conversations between Gendleman and Gray, arrangements were made to consummate this loan transaction on July 20, 1989. On that date, Gendleman drove the Debtor in his car, despite the fact that the Debtor also owns a car herself, from the Home in West Philadelphia to Courtesy's office, located in Bensalem Township in the Northeast suburbs of Philadelphia, a distance of over 10 miles. The Debtor testified that she had never dealt with nor heard of Courtesy before this transaction and did not know where Courtesy's office was located.

When the Debtor arrived at Courtesy's office, the following documents relevant to the transaction were already completely

filled out, except for signatures: the federal TILA disclosure statement, the statement of loan, the mortgage, and the notice of the Debtor's right of rescission, necessary because Courtesy was taking a mortgage on the Home as security. Gray explained the various loan documents to the Debtor and requested that she sign them. While the loan transaction was being consummated, Gendleman was standing nearby. The Debtor signed the papers, and Gendleman then promptly drove her back to the Home in his car.

The TILA disclosure statement indicates that this transaction was written as a straight money loan from Courtesy to the Debtor under the CDCA, rather than as an installment sale of home improvements under the HIFA. The disbursements of the loan proceeds are disclosed as $2,994.73, $300 of which is to be paid to Cohen Insurance Agency ("Cohen Ins.") and the balance to L & G and the Debtor. Purchases of credit life and disability insurance, at $77.22 and $135.25, respectively, and a $45 cost to record the mortgage, raise the Amount Financed to $3,252.20. This balance is to be repaid in 36 monthly installments of $130, which contemplates total payments of $4,680.00. Finance charges total $1,427.80, an Annual Percentage Rate ("APR") of 25.4 percent.

The HIFA limits finance charges to "eight dollars ($8) per one hundred dollars per annum ... computed on the principal amount of the contract...." 73 P.S. § 500–301(a). Assuming that $3,252.20 were the "principal amount of the contract" for purposes of the HIFA, the maximum finance charges payable under the HIFA would have been $780.53, an APR of 14.51 percent. Therefore, by writing this transaction under the CDCA instead of under the HIFA, Courtesy realized additional finance charges of at least $647.27, an increment of the finance charges by over eighty-five (85%) percent.

Above the parties' signatures, the following language appears in a box:

This Notice ☒ Does Apply ☐ Does not Apply:

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

This language is garnered from the HDC Reg., 16 C.F.R. § 433.2(a).

During his conversation with the Debtor on July 20, 1989, Gray did not inform her that she could obtain a loan under the HIFA at a lower interest rate, although he admitted that he knew that the maximum interest rate permissible under the HIFA was less than the maximum rate allowed under the CDCA.

Gray also told the Debtor that Courtesy required that she have property insurance on her Home as a prerequisite for obtaining the loan. Having paid off the mortgage on the Home several months before, the Debtor had no insurance on the Home at that time. The cost for the Debtor's previous policy, obtained through Cohen Ins., had been $71.00 for one year's coverage. This low figure apparently resulted from the Debtor's valuation of her Home at $9,000. The $300 cost was derived from the acquisition of insurance on the Home in the amount of $30,000.

The principal factual debate between the parties concerns this insurance acquisition. The Debtor was steadfast in her contentions that she never valued her Home at more than $9,000, and that she had never selected Cohen Ins. to purchase a policy in this transaction, testifying that she was unaware of the existence of Cohen Ins., even though Union had apparently obtained insurance on the Home through that agency. Gray was just as certain that he had received information that the Home was worth $30,000 or more, and that, since Courtesy did not do business regularly with Cohen Ins. either, *he* did not select it to purchase the policy in this transaction.

Under the TILA and its applicable Regulations, the amount of an insurance premium on property given as collateral in a financing transaction can be excluded from the finance charge in the transaction only if (1) the consumer is given an express notice of a right to choose the insurance and, (2) if coverage "is obtained from or through the creditor," the premium and term of the insurance, if less than the term of the contract, are disclosed. 12 C.F.R. § 226.4(d)(2). *See In re Wright,* 127 B.R. 766, 769–71 (Bankr.E.D.Pa.), *aff'd,* 133 B.R. 704 (E.D.Pa.1991); *In re Moore,* 117 B.R. 135, 138–49 (Bankr.E.D.Pa.1990), *aff'd,* C.A. No. 90–6451, 1991 WL 146241 (E.D.Pa. July 24, 1991); and *In re Steinbrecher,* 110 B.R. 155, 162–65 (Bankr.E.D.Pa.1990). The policy premium paid to Cohen Ins. in the instant transaction was excluded from the finance charge by Courtesy. It is undisputed that the TILA disclosure *did* state that the Debtor could choose the insurer, unlike the statements in issue in *Wright, Moore,* and *Steinbrecher.* However, the term of the insurance in issue was for one year and the term of the loan was three years, and the amount paid to Cohen Ins. was not disclosed on the insurance section of the disclosure statement. Therefore, the parties debate in earnest whether the insurance was obtained "from or through the creditor."

The Debtor argues that Courtesy must have obtained the insurance, since she was unaware of it. Courtesy argues that the Debtor must have obtained it and is suffering a lapse of memory, as it did not obtain the insurance.

Both parties, perhaps because they fear that such a concession would weaken their respective positions, fail to argue the obvious. It is apparent that Gendleman obtained Cohen Ins. as the insurer, probably obtaining the identity of this agency from perusal of the Debtor's prior transaction with Union, in connection with which Cohen Ins. was the insurance agent. Gendleman is the one who apparently determined that the value of the Home was $30,000 or more, and apparently passed this information to Courtesy without advising the Debtor of what he was doing or advising Courtesy that he was acting without the Debtor's input.

Having made this factual finding, we find the legal issue of whether the insurance was obtained "from or through the creditor" remains a difficult legal issue to resolve. The resolution depends upon whether Gendleman is properly classified as the agent of either the Debtor or Courtesy or both in the transaction. As we noted at the outset, this is an issue which we need not resolve to decide this case and therefore prefer to leave undecided.

In any event, on July 25, 1989, after the Debtor's "normal" three-day rescission period had expired, 15 U.S.C. § 1635(a), Courtesy issued checks payable solely to L & G in the amount of $2,694.73, despite the reference to the Debtor as co-payee on the disclosure statement; and to Cohen Ins. in the amount of $300.00. Ironically, the Cohen Ins. check was erroneously mailed to the Debtor, who testified that she put it in an envelope, without a letter, and sent it to Cohen Ins., who eventually cashed it. Even more ironically, LTD Assurance, the insurer in the transaction, ultimately sent a notice, apparently to both the Debtor and Courtesy, stating that the total premium required for the property insurance was $369.77, not $300.00. However, neither the Debtor nor Courtesy responded to the notice, and the insurance was cancelled in October, 1989, because the premium amount in excess of $300.00 was not paid.

On or about August 15, 1989, Courtesy called the Debtor to determine whether the heater and electric box had been installed by L & G, and she answered in the negative. The heater was not installed until late September, 1989, and was not connected to the electrical system until October, 1989. The Debtor delayed making her first payment to Courtesy until the heater was functioning, and apparently has continuing complaints about L & G's services. Courtesy's counsel indicated, at trial, that his client, consistent with its engagement due to the inclusion of the language of the HDC Reg. in the contract, intended to resolve the Debtor's breach of warranty complaints.

The Debtor ultimately began making payments and, according to Courtesy's rather cluttered ledger cards, appears to have made payments through early 1991. The Debtor's counsel alleges, in his Brief, that she has paid a total of $2,092.95. Courtesy did not dispute this figure in its subsequent submissions, and we therefore accept this figure as basically accurate.

Certain small portions of the payments, which were made with significant irregularity in amounts and payment dates, are credited on the ledger cards to interest, although most is attributable to principal. Neither party points to any provision in any of the relevant loan documents which provides for any particular allocation of the Debtor's payments between principal and interest. *Compare In re Grigsby*, 127 B.R. 759, 765–66 (E.D.Pa.1991) (*"Grigsby II"*).

On May 17, 1991, the Debtor, through her counsel, forwarded a letter to Courtesy demanding rescission of this transaction under the TILA. Courtesy responded to this letter about a one week later, informing the Debtor that Courtesy would not agree to rescind this transaction. This proceeding followed.

In her Complaint, the Debtor makes the following claims under the following respective statutes: (1) Rights to rescission of the loan and recoupment under TILA, contending that the "correct" maximum finance charge and APR were not disclosed under the applicable HIFA because of the "body-dragging" aspect of the transactions, and that the deficiencies in the insurance disclosures rendered the amount financed incorrect as well; (2) Usury, arising from the excess finance charges flowing to Courtesy as the result of its writing this transaction under the CDCA instead of under the HIFA; and (3) Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, *et seq.* (referred to hereinafter as "UDAP," a law regulating *u*nfair and *d*eceptive *a*cts and *p*ractices), in light of Courtesy's violations of the HIFA in light of the "body-dragging" aspects of the transaction.

## D. DISCUSSION/CONCLUSIONS OF LAW

### 1. THE INSTANT TRANSACTION, AN ARCHETYPE OF "DRAGGING THE BODY," WAS IN FACT WITHIN THE SCOPE OF THE HIFA.

In an Opinion supporting reversal in a split decision of the Pennsylvania Superior Court in *Anderson v. Automobile Fund,* 258 Pa.Super. 1, 15, 391 A.2d 642, 649 (1978), addressing automobile financing, highly-respected Judge Edmond B. Spaeth, Jr., said, of "dragging the body," that

> [this] term describes the technique whereby an automobile dealer who is unwilling or unable to extend credit to a potential customer persuades the customer to obtain a loan from a specified lender, usually a consumer discount company, with which the dealer has established a prior understanding. The dealer plays an active role in arranging the financing between the discount company and the potential customer (he "drags the customer's body" to the discount company). As compensation, the dealer receives an economic benefit at least to the extent that the customer has been provided with the funds necessary to buy the used car....

*See also* Comment, *"Dragging the Body"—Deceptive Automobile Financing in Pennsylvania with Proposed Legislative Remedies,* 34 U.PITT.L.REV. 429, 432–34 (1973).

As we thus described in *In re Russell,* 72 B.R. 855, 871 (Bankr.E.D.Pa.1987), Pennsylvania has three separate sales finance laws:

> In 1947, the legislature put into place the Motor Vehicle Sales Finance Act, 69 P.S. § 601, et seq. (hereinafter referred to as "MVSFA"), which regulated installment sales of motor vehicles. In 1963, it passed the Home Improvement Finance Act, 73 P.S. § 500–101, et seq. (hereinafter referred to as "HIFA"), to regulate financing transactions in the home-improvement field. Finally, in 1966, the legislature promulgated the Goods and Services Installment Sales Act, 69 P.S.

§ 1101, et seq. (hereinafter referred to as "GSISA"), which regulated the residuum of installment sales contracts not covered by the MVSFA or the HIFA. Then, in 1968, UDAP was passed, and, in 1976, 73 P.S. § 201–9.2 was added to UDAP to provide a private right of action to consumers for UDAP violations.

We also observed, at *id.*, that

[w]hat is remarkable about this body of Pennsylvania consumer protection legislation is the absence of any specific section, except 73 P.S. § 201–9.2 [of UDAP], which provides a private right of action for consumers aggrieved by most violations of these laws.

The HIFA, although lacking civil remedies for consumers subjected to its violations comparable to those in the subsequently-enacted TILA or UDAP, is a comprehensive piece of consumer-protection legislation. It mandates many specific disclosure requirements for contracts within its scope. 73 P.S. §§ 500–201 to 500–205. It prohibits certain contractual provisions. 73 P.S. §§ 500–206 to 500–209. Very significant, as of the date of its enactment, were provisions which prohibited the cutting off of a consumer's defenses against "holders in due course" of HIFA contracts unless a specific notice of assignment were first delivered to the consumer. 73 P.S. §§ 500–207, 500–208.[2]

The HIFA also establishes a finance-charge limitation of eight (8%) percent "add-on" interest, *i.e.*, the interest computed on the principal balance over the entire contract term, for contracts within its scope. 73 P.S. § 500–301(a). Under the TILA, creditors, including contractors covered by the HIFA, are required to disclose interest calculated on a "declining-balance" method, pursuant to which the HIFA maximum interest rate was revealed to yield an APR of between 14 and 15 percent, depending on the amount financed and the term of the contract. The maximum interest rate allowed under the HIFA has never been changed over the ensuing 28 years of high interest rates and low interest rates, unlike those of its "sister" installment sales finance acts, the MVSFA and the GSISA, which were revised upwards in the early 1980's.

The key to any "dragging the body" case is the definitional one of whether a certain contract fits within an installment sales act. If it does, then the transaction must be written under that act, and attempts to write it as a loan are improper. Installment sales acts must be prophylactic in scope and effect, or they will be susceptible to evasionary devices which will entirely eliminate their practical impact.

The HIFA, 73 P.S. § 500–102(10), thusly defines contracts within its scope:

(10) "Home improvement installment contract" or "contract" means an agreement covering a home improvement installment sale, whether contained in one or more documents, together with any accompanying promissory note or other evidence of indebtedness, to be performed in this Commonwealth pursuant to which the buyer promises to pay in installments all or any part of the time sale price or prices of goods and services, or services. The meaning of the term does not include such an agreement, if (i) it pertains to real property used for a commercial or business purpose; or (ii) it covers the sale of goods by a person who neither directly nor indirectly performs or arranges to perform any services in connection with the installation of or application of the goods; or (iii) it covers only an appliance designed to be free-standing and not built into and permanently affixed as an integral part of the structure such as a stove, freezer, refrigerator, air conditioner, other than one connected with a central heating system, hot water heater and the like: or (iv) it covers the sale of goods and the furnishing of services or the furnishing of services thereunder for a cash price stated therein of three hundred dollars ($300) or less; (v) the loan is contracted for or obtained directly by the retail buyer from the lending institution, person or corporation; or (vi) the loan is insured, or a written commitment to insure it has been

---

2. The effect of this provision was subsequently superseded by the federal HDC Reg.

issued, pursuant to national housing legislation.

■ This definition recites a very broad definition and six exceptions, most of which (except (v)) clearly are not applicable here. The key components of a HIFA contract are that it involve home improvements and that these improvements are to be financed by the contractor, as opposed to by a direct loan obtained independently by the consumer. The instant transaction clearly involves a home improvement. The only difficult issue is whether the contractor's ubiquitous presence in the transaction eliminates the exception for direct loans, contained in 73 P.S. § 500–102(10)(v). We hold that it does, since the Debtor made no effort whatsoever to obtain or contract for a loan directly from Courtesy or any other lender.

We find support for this decision in observing the elaborate requirements of the HIFA. The Pennsylvania legislature obviously intended this legislation to apply to a broad range of home-improvement financing transactions. It is inconceivable that the legislature could have intended that its handiwork would be able to be evaded by a practice so transparently evasive of its scope as the sort of "dragging the body" which pervades the instant transaction.

Gendleman, the home improvement contractor, clearly orchestrated (and, as the boondoggle over the insurance reveals, occasionally misdirected) this entire transaction. He entered into a home improvement contract with the Debtor in her Home which he certainly could have written under the HIFA and assigned to Courtesy, as in the Debtor's transaction with Union. See page 135 n. 1 *supra*. However, in concert with Courtesy, he obtained the necessary financial information which allowed Courtesy to write up all of the papers without Courtesy's agents ever so much as seeing the Debtor, and then delivered the Debtor's body to Courtesy. If such a transaction is allowed to stand as a "legitimate" CDCA loan which is beyond the reach of the HIFA, then the purported broad scope and limited exceptions of the HIFA would effectively be punctured with a gaping loophole, which would allow lenders and contractors to choose when *they* wished to *allow* the HIFA to apply to a transaction.

Although Gendleman clearly orchestrated the transaction, the complicity of Courtesy in this scheme cannot be brushed aside. Gray and therefore Courtesy knew Gendleman from many past dealings. Courtesy was bound to know that it was in fact engaging in HIFA transactions, in which its only flesh-and-blood contact with a customer, prior to the closing, was through Gendleman. Certainly, Courtesy's degree of sophistication greatly exceeded that of the Debtor. Having reaped the benefit of thousands of extra finance charge dollars from its past "body-dragging" transactions with Gendleman, Courtesy must accept the burden of the consequences when the true nature of its course of dealings with Gendleman are brought to light in this one isolated instance.

Courtesy recognized its status as the lender in a "purchase-money loan" under the applicable federal HDC Reg. Included in the contract was the mandatory language of the HDC Reg., 16 C.F.R. § 433.-2(a). The HDC Reg. applies only "in connection with any *sale* or *lease* of goods or services to consumers," *id.* (emphasis added). It does *not* apply in the case of a bona fide direct loan of which the proceeds are incidentally used to finance a consumer-purchase. The HDC Reg. thusly defines a "purchase money loan," at 16 C.F.R. § 433.1(d):

> (d) *Purchase money loan.* A cash advance which is received by a consumer in return for a "Finance Charge" within the meaning of the Truth in Lending Act and Regulation Z, which is applied, in whole or substantial part, to a purchase of goods or services from a seller who (1) *refers consumers to the creditor* or (2) is affiliated with the creditor by common control, contract, or business arrangement (emphasis added).

Courtesy apparently believed, as do we, that the instant transaction fits this definition, since Gendleman was a seller who regularly referred customers, including the Debtor, to Courtesy. Therefore, it proper-

ly supplied the notice required by the HDC Reg.

The responses of the Pennsylvania courts to "dragging the body" have not always been consistent. We are bound to follow Pennsylvania law as it has been developed by the Pennsylvania Supreme Court. The most pertinent pronouncement of that court is in its decision in *Casey v. Philadelphia Auto Sales Co.,* 428 Pa. 155, 236 A.2d 800 (1968). In that case, the Supreme Court unanimously reversed the lower court's granting of the equitable remedy of rescission to buyers of a defective motor vehicle financed as a direct loan because the plaintiffs were held to have, at their disposal, the adequate legal remedy of revocation of acceptance of the vehicle. However, the court, in finding that a legal remedy was available to them, held that

> it must be clear from the record that the Finance Company was aware it was financing the purchase of a motor vehicle, [and] it could not contend it was a holder in due course: Motor Vehicle Sales Finance act ... 69 P.S. § 615, subs. F and G ...

428 Pa. at 127, 236 A.2d at 801–02.

Judge Spaeth's powerful Opinion in support of reversal in *Anderson* offsets any weight which the opinion in support of affirmance, which carried the day for the lender, provided in that case. Pennsylvania trial court decisions involving the MVSFA are similarly inconclusive. In *Paul R. Webber, Inc. v. Duffy,* 3 UCC Rep.Serv. 654 (Lebanon Co. C.P.1965), the court determined that a contract written as a direct loan was in fact a transaction with the scope of the MVSFA. However, in *West Milton State Bank v. Foust,* 2 Pa. D. & C.3d 294 (Northumb. Co. C.P.1976); and *Beacon Loan Corp. v. Kemmerer,* 51 LUZERNE L.REG. 199 (Luzerne Co. C.P.1961), arguments that transactions written as loans were within the scope of the MVSFA were rejected. We do note, however, that the "body-dragging" claims in *Foust* and *Kemmerer* were not factually strong. The *Foust* consumer purchased a mobile home from the federal Department of Housing and Urban Development in a transaction financed by a bank, which involved no factual allegations of "body-dragging" or deception of the consumer. In *Kemmerer,* the consumer made two separate loans to his vehicle purchase, and thus was quite aware of the distinction between the seller and the lenders. *See also In re Joyce,* 41 B.R. 249, 250 (Bankr. E.D.Pa.1984), *aff'd sub nom. Joyce v. Fidelity Consumer Discount Co.,* 84–3740 (E.D.Pa. August 20, 1986), *aff'd,* 800 F.2d 1134 (3d Cir.1986) (debtor's principal complaint apparently was that the auto dealer who had arranged financing failed to do so with "Fidelity Bank," instead utilizing a loan company with a similar name).

All of the foregoing cases involved interpretation of the MVSFA. Persuasive to the writer of the Opinion in support of affirmance in *Anderson* was a provision in the MVSFA, 69 P.S. § 636, which expressly provides that the MVSFA "shall not affect or enjoin business conducted lawfully" under the CDCA. 258 Pa.Super. at 10–11, 391 A.2d at 646–47.

There is no analogue to 69 P.S. § 636 in the HIFA, nor in the GSISA. Perhaps this explains why the only two cases decided under those Acts condemn "dragging the body" as an illegal, evasionary device. In *Iron & Glass Bank v. Franz,* 9 Pa.D. & C.3d 419 (Allegheny Co. C.P.1978), the court provides an extremely thoughtful analysis in which it concludes that a lender who wrote a health spa service contract under the CDCA was in fact subject to the GSISA. The remedial aspect of the GSISA and the other Pennsylvania installment sales acts is noted. *Id.* at 423–24. The concordance of its result with the scope of the HDC Reg. and the broad scope of UDAP espoused in *Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 329 A.2d 812 (1974), is emphasized. *Id.* at 426–30. The presence of 69 P.S. § 636 is there expressly found to have been a significant distinction between the MVSFA, as analyzed by the Opinion in support of affirmance in *Anderson,* and the GSISA. *Id.* at 426.

Only one case considers "body-dragging" in the context of the HIFA, *Transnational Consumer Discount Co. v. Weaver,* 52 ERIE CO.LEG.J. 4 (Erie Co. C.P.1968). In

a lengthy Opinion which emphasizes the complicity of the lender in failing to open its eyes to detect the seller's fraudulent scheme to sell a vacuum cleaning system to the consumer as a sales sample, despite its claims of ignorance of the seller's fraudulent schemes, *id.* at 10–12, the court finds that the direct loan form of the transaction was "but a facade to avoid the implications and the prohibitions of the [HIFA], an appearance that is superficial and does not mask the true situation." *Id.* at 14. Finding that, like the instant Debtor, the *Weaver* consumers never gave "the slightest indication ... of selecting their own financial institution as an alternative to Transnational," *id.* at 16, the court determines that the loan should have been written under the HIFA.

It is clear to us that, if we gave any degree of sanction to the blatant and admitted "body-dragging" which occurred in this case, we would be fostering a circumvention of the HIFA. The elimination of such a circumventive device is reminiscent of the Supreme Court's defense, in *Mourning v. Family Publications Services, Inc.*, 411 U.S. 356, 366–67 & n. 26, 93 S.Ct. 1652, 1659 & n. 26, 36 L.Ed.2d 318 (1973), of the "four-installment rule" established by the Federal Trade Commission, which required TILA disclosures in any transaction where payments are made in four or more installments, even if no finance charge were nominally imposed. The court noted that failing to uphold the "four-installment rule" would permit "manipulation [which] would

render the Act a futile gesture in the case of goods normally sold by installment contract." *Id.* at 367, 93 S.Ct. at 1659.

Because of the fertility of the minds of those who would devise schemes to circumvent remedial consumer protection laws, these laws must be interpreted with a flexibility necessary to preserve their spirit. Courts have repeatedly interpreted Pennsylvania law to overcome circumvention devises in other contexts. *See, e.g., In re Stewart*, 93 B.R. 878, 882–87 (Bankr. E.D.Pa.1988) (imposition of "hidden finance charges" included in the excessive purchase price of consumer goods found violative of TILA, GSISA, and UDAP); *Bonczek v. Pascoe Equipment Co.*, 304 Pa.Super. 11, 17–21, 450 A.2d 75, 78–80 (1982) (contract to acquire farm equipment which was written as a lease was in fact an installment sale); and *Chandler v. Riverview Leasing, Inc.*, No. 1984–CE–2736 (Northampton Co. C.P. May 14, 1986) (VAN ANTWERPEN, J.) (rent-to-own contract, although written as a lease, held to actually be a contract within the scope of GSISA).

We conclude that the instant transaction is clearly a "purchase money loan" for purposes of the HDC Reg. Therefore, we find that it is very likely that the Pennsylvania Supreme Court would, consistently with the federal HDG Reg.,[3] adhere to its decision in *Casey, supra,* and conclude that the undisputed, archetypical "dragging the body" which pervaded the instant transaction placed the transaction in issue within the scope of the HIFA.

---

**3.** Prior to an amendment to the TILA, effective in 1982, a "credit sale" under the TILA included a transaction in which credit was "arranged by the seller." 15 U.S.C. § 1602(g). In *Manning v. Princeton Consumer Discount Co.*, 533 F.2d 102, 104–05 (3d Cir.), *cert. denied*, 429 U.S. 865, 97 S.Ct. 173, 50 L.Ed.2d 144 (1976), an automobile dealer was held liable for failing to provide "credit sale" disclosures in a credit transaction which it arranged for a loan company. The court refused, however, to hold the loan company liable for the TILA violations in issue, reasoning that former 12 C.F.R. § 226.6(d), relating to "multiple creditors," rendered only the seller liable. *But see, e.g., Price v. Franklin Investment Co.*, 574 F.2d 594, 599–602 (D.C.Cir.1978) (both loan company and seller held liable in "credit arrangement" situation). The present TILA definition of "credit sale," 15 U.S.C. § 1602(g), omits any reference to arrangement of credit by

the seller. That aspect of the *Manning* holding which confined liability to the seller has also been rendered passe by amendments to the TILA. It is now required, as to "multiple creditors," that

> [i]f a transaction involves more than one creditor, only one set of disclosures shall be given and the creditors shall agree among themselves which creditor must comply with the requirements that this regulation imposes on any or all of them.

12 C.F.R. § 226.17(d). Clearly, as between Gendleman, who provided no disclosures whatsoever to the Debtor, and Courtesy, which provided a full set of disclosures to her, there was at least a tacit agreement that Courtesy would provide the requisite TILA disclosures and is therefore liable, under the current Regulations, if the disclosures are errant.

2. SINCE COURTESY IMPOSED A FINANCE CHARGE AND AN APR IN EXCESS OF THAT ALLOWED UNDER APPLICABLE STATE LAW IN THE INSTANT TRANSACTION, COURTESY HAS COMMITTED "MATERIAL VIOLATIONS" OF THE TILA, RENDERING THE PARTIES' CONTRACT SUSCEPTIBLE TO RESCISSION.

As we indicated in our discussion at pages 136–37 *supra,* Courtesy based its calculation of the appropriate finance charge and corresponding APR in the instant transaction upon the limits set forth in the CDCA, which allows significantly greater charges and higher rates than does the HIFA. Consequently, Courtesy contracted with the Debtor to receive finance charges in excess of the lawful maximum interest rate chargeable to the Debtor, in violation of 41 P.S. § 501 of Act 6.

Clearly, Courtesy has violated state law. However, as the parties both observe in their respective post-trial submissions, quoting *Gambardella v. G. Fox & Co.,* 716 F.2d 104, 116 (2d Cir.1983),

> Courts have been unable to agree whether a disclosure statement which claims a right or interest prohibited by state law violates the Act. *Compare Tinsman v. Moline Beneficial Fin. Corp.,* 531 F.2d 815 (7th Cir.1976) (violation), *with Pennino v. Morris Kirschman & Co.,* 526 F.2d 367, 371 (5th Cir.1976) (no violation). *See Veney v. First Virginia Bank–Colonial,* 535 F.Supp. 181, 183–190 (E.D.Va.1982); and cases discussed therein.

We agree with the *Gambardella* court that the cases addressing this issue have not been totally consistent. We believe, however, that the correct answer to the question of whether a violation of state law by a creditor also constitutes a violation of TILA is that it depends on the state-law violation in issue.

Many of the cases collected in *Veney* involve, as does *Veney* itself, the failure of a creditor to disclose that a security interest in after-acquired personal property is limited to property acquired by the borrow-

er within ten days after the creditor gives value for the security interest, a limitation which is common under the law of many American jurisdictions because it is included in § 9–204(2) of the Uniform Commercial Code. We note that a decision of present Court of Appeals Judge Walter K. Stapleton, in *Cadmus v. Commercial Credit Plan, Inc.,* 437 F.Supp. 1018, 1019–21 (D.Del.1977); and of our local district court, in *Reid v. Liberty Consumer Discount Co.,* 484 F.Supp. 435, 440–41 (E.D.Pa.1980), have held that the failure to disclose this state-law limitation on the security taken on a TILA disclosure statement *is* a TILA violation. In fact, *Reid,* decided prior to the amendment to the TILA limiting the definition of "material disclosures" sufficient to trigger a rescission right to only certain specific disclosures, 15 U.S.C. § 1602(u), held that this violation was sufficiently "material" to justify a rescission. *Id.* at 440–41. It is therefore well-established in this Circuit that a recitation in a TILA disclosure statement which is violative of state law may, at least in some circumstances, trigger a TILA violation.

On the other hand, we understand that "the [TILA] does not require a creditor to narrate the law of the forum state." *Pennino, supra,* 526 F.2d at 371. While, as the Debtor argues, "[t]he disclosures shall reflect the *legal* obligation between the parties," 12 C.F.R. § 226.17(c)(1) (emphasis added), the Official Staff Commentary on Regulation Z Truth in Lending, ¶ 226.17(c)1, quoted by Courtesy, provides that, merely because a contract term "may later be deemed unenforceable by a court ... does not, by itself" render the disclosures based on that term violative of the TILA. We interpret these statements to mean that not every, trivial violation or failure to accurately regurgitate state-law in a TILA disclosure statement triggers a TILA violation. *See Wright, supra,* 127 B.R. at 771–72 (alleged violation in disclosure statement which arises solely due to an error in a previous transaction between the parties is not actionable).

However, a failure to accurately disclose the meaning and effect under state law of a very significant term of a consumer-fi-

nance contract should constitute a violation of the TILA. TILA often "operated[s] in tandem with ... state laws." *Russell, supra,* 72 B.R. at 861. Most creditors' rights, including the maximum rates of interest that creditors may charge, arise from state law. The underlying theory of the TILA, *i.e.,* that creditors are required to inform consumers of the cost of credit, in certain standardized terms, *see id., supra,* depends upon the creditor's providing accurate disclosures of the finance charge and the APR in the transaction to the consumer in accordance with state law. Therefore, if disclosures of these terms are incorrect, because applicable state law dictates that the terms disclosed are usurious or otherwise illegal, then a TILA violation must necessarily result. Consequently, it follows that Courtesy, having contracted to charge and hence disclosed to the Debtor a finance charge and an APR which were violative of the applicable HIFA, and hence usurious, must be found, on that basis alone, to have violated the TILA.

Statements of the amount of the finance charge and the APR constitute "material disclosures" required by the TILA. 15 U.S.C. § 1602(u). Courtesy's failure to accurately provide "material disclosures" required by the TILA to the Debtor entitled her to rescind the instant transaction, 15 U.S.C. § 1635(a), at any time within three years from the date of the transaction. 15 U.S.C. § 1635(f). The Debtor therefore correctly asserted a right to rescind this transaction under the TILA, solely on the basis of the transaction's "body-dragging" aspects, which rendered the disclosures of the finance charge and the APR in the transaction well out of compliance with the HIFA.

3. THE DEBTOR'S VALID RESCISSION OF THE CONTRACT, WHICH ITSELF RESULTS IN COMPREHENSIVE RELIEF TO HER, ELIMINATES THE INCURRENCE OF "ACTUAL DAMAGES" BY THE DEBTOR, WHICH ARE NECESSARY TO TRIGGER STATE–LAW REMEDIES.

Courtesy's failure to respect the Debtor's valid rescission of the instant transaction renders it subject to disastrous consequences under the TILA. *See* 15 U.S.C. § 1635(b); *In re Milbourne,* 108 B.R. 522, 530–33 (Bankr.E.D.Pa.1989); and *In re Brown,* 106 B.R. 852, 861–62 (Bankr. E.D.Pa.1989).

Courtesy's security interest in the Home must be terminated. *See* 15 U.S.C. § 1635(b); *Milbourne, supra,* 108 B.R. at 532; and *Brown, supra,* 106 B.R. at 862. This eliminates Courtesy's standing as a secured creditor likely to receive any substantial distribution under the terms of the Debtor's Chapter 13 plan. *See Brown, supra,* 106 B.R. at 862.

The Debtor is also relieved of the burden of paying "any finance or other charges" related to the advance of credit in the transaction to Courtesy. The Debtor argues, we think correctly, that the only charge reflected by Courtesy on the disclosure statement which was not related to the advance of credit by Courtesy was the principal balance of $2,694.73 paid by Courtesy to Gendleman in the transaction. From this figure, the Debtor's total payments of $2,092.95 may be deducted, leaving a balance of $601.78. This balance of $601.78 is totally wiped out by the recoupment penalty of up to $1,000 arising from Courtesy's TILA disclosure violations in writing up the transaction. *See, e.g., Brown, supra,* 106 B.R. at 862; and *In re Celona,* 90 B.R. 104, 115 (Bankr.E.D.Pa. 1988), *aff'd sub nom. Celona v. Equitable Nat'l Bank,* 98 B.R. 705 (E.D.Pa.1989).

■ Furthermore, Courtesy's refusal to properly respond to the Debtor's valid rescission of the parties' contract constitutes an additional, separate TILA violation in itself. *See* 15 U.S.C. § 1640(a)(2)(A). *See, e.g., Aquino v. Public Finance Consumer Discount Co.,* 606 F.Supp. 504, 509–11 (E.D.Pa.1985); *Milbourne, supra,* 108 B.R. at 532 (four valid rescissions; four penalties payable); and *Brown, supra,* 106 B.R. at 862.

And, finally, Courtesy is liable to the Debtor's counsel for its reasonable attor-

neys' fees and costs expanded in pursuing this action. 15 U.S.C. § 1640(a)(3). *See, e.g., Brown, supra,* 106 B.R. at 862; and *Celona, supra,* 90 B.R. at 115–16.

The Debtor seeks, in addition, treble damages based, alternatively, upon 41 P.S. § 503 of Act 6 and/or 73 P.S. § 201–9.2(a). In making this claim, it is incumbent upon the Debtor to confront the holding of Judge Fox in *Steinbrecher, supra,* 110 B.R. at 159–60, that, once the remedy of rescission under TILA is granted as to a certain transaction, then the Debtor no longer can prove the "actual damages" necessary to recover under 41 P.S. § 503 or 73 P.S. § 201–9.2(a).[4]

Judge Fox opines in *Steinbrecher* that the result reached by us in *Milbourne* may be inconsistent with his holding in *Steinbrecher. See* 110 B.R. at 160. In *Milbourne,* we granted the debtor's prayer to rescind four of her contracts with the lender, because of the lender's failure to disclose its retention of multiple mortgages, and, in addition, awarded her $100 damages for violating UDAP by "flipping" her loan *i.e.,* rewriting the loan without advising her of the advantages of making new, separate loans [5] in each of five transactions.

We continue to believe this result in *Milbourne* was correct, and, further, that it was not inconsistent with the result in *Steinbrecher.* The UDAP violations in *Milbourne* were entirely unrelated to the TILA claims which were held sufficient to justify rescission. It appears illogical to us to exonerate a lender from penalties for separate, state-law violations, because the lender also committed another, independent illegal act which constituted a TILA violation and which triggered a right to rescission.

██ However, here, the state-law violations and the TILA violations overlap. Indeed, the only TILA violations which we have found present in the transaction resulted solely from Courtesy's violations of state law in writing this loan. In these circumstances, it appears that application of the reasoning of *Steinbrecher* that a rescission of a transaction under federal law eliminates any claim of "actual damages" under state law is appropriate. All of the consequences of Courtesy's overcharge of financial charges under state law are eliminated by the TILA rescission.

We also note that it is difficult to measure the state-law remedies to which the Debtor might be entitled. If we employed the reasoning which we adopted in *In re Grigsby,* 119 B.R. 479, 491–94 (Bankr. E.D.Pa.1990) (*"Grigsby I"*), *vacated & remanded, Grigsby II, supra;* and *Stewart, supra,* 93 B.R. at 887, no damages under Act 6 or UDAP would be recoverable, because the Debtor has not paid any interest in excess of the entire amount of interest due under the contract. In *Grigsby II,* the district court held that we erred in not measuring "excess interest" as to interest paid as of a given point in time, 127 B.R. at 764–65, and in failing to give effect to a contractual provision that each payment should be applied first to interest due, rather than first to principal, as would be assumed in the absence of a contract. *Id.* at 765–66.

Here, the parties have not identified any contractual provision relevant to allocation of payments between principal and interest. Our only point of reference on the issue of allocation is Courtesy's cluttered ledger cards, from which it is difficult to determine how or why the Debtor's payments have been so allocated by Courtesy. *See In re Lease–A–Fleet, Inc.,* 131 B.R. 945, 949–51 (Bankr.E.D.Pa.1991) (in absence of the debtor's allocation of payments, a creditor may allocate them as it wishes). If Courtesy's allocation method could ever be fathomed, we would then be faced with the difficult task of determining the difference between how payments should have been allocated had the transaction been properly written under the HIFA and how the payments were in fact allocated. We consider calculation of such alloca-

---

4. Ironically, the state law claims which Judge Fox declined to address in *Steinbrecher* centered upon whether a "body-dragging" transaction violated the HIFA. *See* 110 B.R. at 157–58, 159.

5. In *Milbourne,* we, with supporting citations, rejected the implicit holding in *Joyce,* 41 B.R. at 252, which suggests that a creditor's failure to disclose less expensive financing alternatives could never be violative of UDAP.

tion to be close to guesswork on the basis of this record. Therefore, it is convenient (and just), as well as legally appropriate, to confine the Debtor's remedies to the relatively straightforward computation of the Debtor's appropriate remedies and damages under the TILA.

E. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

ORDER

AND NOW, this 4th day of December, 1991, after a hearing to consider confirmation of the Debtor's Plan of Reorganization in the above-captioned main bankruptcy case and trial of the above adversary proceeding on October 8, 1991, and upon careful consideration of the parties' thoughtful respective post-trial submissions in the adversary proceeding, it is ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiff–Debtor, JOYCE BROWN ("the Debtor"), and against Defendant COURTESY CONSUMER DISCOUNT CO. ("Courtesy"), as to certain claims made in her Complaint, as described in the foregoing Opinion.

2. It is DECLARED that the Debtor properly exercised her right to rescind the contract of July 20, 1989, between Courtesy and her in issue, and that therefore this contract is deemed properly rescinded by the Debtor.

3. The claim of Courtesy against the Debtor is STRICKEN.

4. Courtesy is directed to satisfy the mortgage which it has taken against the Debtor's residential real estate at 5019 Brown Street, Philadelphia, Pennsylvania 19139, within fifteen (15) days from the date of this Order.

5. Courtesy shall pay the sum of $1,000 to Defendant EDWARD SPARKMAN, the Standing Chapter 13 Trustee, as damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(i). The said Trustee shall determine whether this sum may be claimed as part of the Debtor's exemptions, and, if it may be, he shall forward this sum to the Debtor forthwith.

6. The parties are urged to attempt to agree upon reasonable attorneys' fees and costs which are due to the Debtor's counsel, pursuant to 15 U.S.C. § 1640(a)(3). If this matter is not resolved within fifteen (15) days, the Debtor's counsel may, within thirty (30) days of this Order, file a Motion requesting a court award of such fees, said Motion to be procedurally in conformity with *In re Meade Land & Development Co.*, 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates*, 78 B.R. 41 (Bankr. E.D.Pa.1987). However, if the Debtor's counsel has made a reasonable request for such fees which is refused, said counsel may recover compensation for time spent on the fee application.

7. The Debtor shall file any Amended Plan which she deems is necessary and appropriate in light of this Opinion to achieve confirmation of a Chapter 13 Plan of Reorganization on or before December 9, 1991.

8. The confirmation hearing in the Debtor's main case remains scheduled on

THURSDAY, DECEMBER 19, 1991, AT 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.